THE UNITED STATES, APPELLANTS, *v.* PEARSON B. READING.

Where there was a grant of land in California, subject to the condition that the grantee should build a house upon it, and have it inhabited within a year from the date of the grant, and also that he should obtain a judicial possession and measurement or survey of it, the evidence shows sufficient reasons for a non-compliance on the part of the grantee.

This court again decides, as in Fremont *v.* United States, 17 How. 560, that a mere omission to comply with these conditions would not necessarily amount to a forfeiture, unless there were circumstances which showed an intention to abandon the property.

Although the title did not become definitive until the grant was approved by the departmental assembly, yet an immediate interest passed by the grant from the governor, whose duty it was (and not that of the grantee) to submit the case to the departmental assembly, and, if they should reject it, then to lay the case before the supreme government of the Republic.

If the governor failed to execute this duty, the title remained as it was after the grant was issued, and is sufficient for confirmation under the act of congress, passed on March 3, 1851, (9 Stats. at Large, 631.)

The evidence in the present case shows that the grantee was a naturalized citizen of the Mexican Republic, and the fact that he joined the troops of the United States when war broke out with Mexico, furnishes no evidence of his intention to abandon the property, nor any reason why the grant should be forfeited.

THIS was an appeal from the district court of the United States for the northern district of California.

The claim was originally presented to the board of commissioners, who confirmed it in December, 1852, to the extent and quantity of six square leagues and no more, as described in the Mexican grant, if that quantity be contained within the boundaries called for in the grant; and if less, then they confirmed it for that smaller quantity.

The United States appealed to the district court, which affirmed the decision of the commissioners. An appeal brought the case up to this court.

The title of Reading is set forth in the opinion of the court, except the conditions of the grant, which were as follows, namely.

" In the name of the Mexican nation I have granted to him said land, subject to the approval of the most excellent departmental assembly, and to the following conditions :—

1. He shall not sell, alienate, or hypothecate it, nor impose on it any tax, entail any other incumbrance, nor shall he donate it.

2. He shall not hinder the cultivation or other profits which the natives of that region may derive from said land.

3. He may inclose it without prejudice to the crossing roads and public uses ; he may enjoy it freely, appropriating it to the cultivation which best suits him, but within a year he shall build a house and it shall be inhabited.

4. The land which has been granted is of the extent of which mention has already been made. The judge who shall give the possession shall cause it to be measured according to ordinance, and the overplus which may result shall remain to the nation for convenient uses.

5. If he contravene these conditions, he shall lose his right to the land, and it shall be denounced by any other person."

The case was argued by *Mr. Cushing,* (attorney-general,) for the United States, and by *Mr. Lawrence* and *Mr. Bibb,* for the appellee. There was also a brief filed upon the side of the appellee, by *Mr. Volney E. Howard.*

*Mr. Cushing* made the following points :—

1. Reading not being a Mexican citizen, could not take and hold a grant of land in a Mexican territory.

For the rule of naturalization prior to 10th September, 1846, see Scmidt's Laws of Spain and Mexico, 353. For additional provisions made then, see Leyes y Decretos, 1844–1846, p. 423.

2. Reading was not entitled to take and hold lands in California, which was frontier territory.

3. The grant was not approved by the departmental assembly.

4. Without the approbation of the departmental assembly, there was no grant passing any title. Fifth regulation of November 21, 1828.

5. Reading would have no claim, in law or equity, upon Mexico to complete and confirm his incipient title, if she had not transferred California to the United States by treaty.

6. Reading abandoned whatever claim he had, before the final conquest by the United States.

*Mr. Bibb* contended that, with respect to the condition of obtaining the approval of the departmental assembly, it was the

duty of the governor, and not the grantee, to lay the case before that body. Fifth and sixth regulations of 1828. The omission or neglect of the governor to do this, could not deprive the grantee of his vested interest. 5 Cranch, 242; 9 How. 333.

So also are the legal maxims, *Nemo punitur sine injuria, facto, seu defalta. Nul prenada advantage de son tort demesne.* Coke's 2 Inst. 287, 713, and maxims at the end of that volume. Domat's Civil Law, book I. title 1, § 5, par. 17, p. 29; Pothier on Obligations, part 2, chap. 3, par. 212; Co. Litt. 205 *b*; 2 Comyn's Dig. Condition, (D. 7,) p. 327; 5 Viner, Condition, (N. *c*,) pleas 23, 25, p. 246.

With respect to the other condition subsequent, namely, the judicial mensuration and marking out of the boundaries, the evidence shows that the grantee was not to blame.

The United States have not claimed nor attempted to exert the power to annul Mexican grants for non-performance of conditions. 9 Stats. at Large, 633, § 11, *et seq.*

Mr. Justice WAYNE delivered the opinion of the court.

We find in the record of this appeal, that Reading, the appellee, was an immigrant from the United States, in the then Mexican territory of California, in the year 1842, and that he afterwards became a citizen of the Mexican republic. After residing there for two years, he petitioned the governor, Michel Torena, for a grant of land called Buena Ventura, situated on the bank of the River Sacramento, bounded on the north by vacant lands; on the east by the River Sacramento, and on the south and west by vacant lands, according to a plat annexed to his petition. The governor referred the petition to the secretary of state for information concerning it. The secretary, in reply, says, the petitioner was a proper person for the governor's favor, and, upon the official certificate of Jno. A. Sutter, (who was military commandant of the northern frontier of California, and charged with civil jurisdiction also,) he declares that the land asked for was vacant, and could be granted. The governor directed the title to be issued, and it was prepared for his signature.

It is as follows :—

" Citizen Michel Torena, General of Brigade of the Mexican Army, Adjutant-General of the Staff of the same, Governor, Commandant-General, and Inspector of the Department of the Californias.

" Whereas, Don Pearson B. Reading—a Mexican by naturalization—has made application, for his personal benefit, for the land known by the name of Buena Ventura, on the margin of

the River Sacramento, from the creek called Lodo, (Lodoso, *Muddy*,) which is on the north as far as the Island de Sangre, with six square leagues in extent; and the proper proceedings and investigations having been previously complied with, according to the provisions of the laws and regulations concerning the matter, by virtue of the authority vested in me, in the name of the Mexican nation, I have granted to him said land, subject to the approval of the most excellent departmental assembly."

There are also conditions annexed to the grant, which may be seen in the reporter's statement of the case. The grant was signed by the governor, and countersigned by the secretary of state, on the 4th of December, 1844, and entered into the archives of the Territory on the same day, with an order from the governor that the title, "being held as valid," should be delivered to the interested party for his security and other purposes.

The power of the governor to make such a grant of land is admitted. The regularity and genuineness of the entire proceeding, and its entry into the archives of the Territory, are not disputed; but Reading's right to a confirmation of it is denied, upon several grounds. Each objection shall have due consideration, not because all of them require it, but to prevent the same points from being urged again in cases of a like kind.

It is said, the grant was provisional only, having been made subject to the approval of the departmental assembly; and, as that had not been given, that it passed no such interest in the land to Reading as entitled him to a confirmation of the grant. Other objections were urged against the confirmation of it, arising out of the national status of Reading when he received the grant, and also out of the fact, that, in the war between Mexico and the United States, he left the standard of the former, and joined the American forces which invaded California. And it was said, as it had been in Frémont's case, that he lost whatever right he had to the land, and subjected it to be denounced by any other person, because he had not complied with the condition to build a house upon it, and to have it inhabited, within a year from the date of the grant, and because he had omitted to obtain a judicial possession and measurement, or survey of it. The last two objections are charges of negligence, which must be determined by the proofs in the cause. In our opinion, they do not show either negligence or omission in the particulars mentioned. The witness, Hensley, says, it was upon his suggestion that Reading applied for the land. He knew the locality of it, from having been there. After stating that he had seen a paper purporting to be a grant of the land, dated in December, 1844, he says that Reading visited it in August, 1845, and that they were ten days together upon the land, looking for suit-

able locations for fields and building sites. That Reading then put upon it a Frenchman named Julian, to build a house for him and to keep possession of it; that, at that time, Reading placed upon the land horses and cattle. That the house was built. It was afterwards burnt by the Indians, and Julian was killed by them. Ford, another witness, who went to that part of the country in March, 1846, as one of a military company to quell an outbreak of the Indians, confirms Hensley's statement in respect to Julian's possession of the land for Reading, but says that he had been forced by the Indians to abandon the house he had built; and that the horses which had been put upon the land, or others belonging to Reading, had been driven from it by Julian, as it was impossible to keep them there on account of the hostilities of the Indians. And Sutter accounts very satisfactorily for Reading's absence from the land during the years of 1845 and 1846, in his reply to the question, if it would have been safe for Reading to have resided personally on his ranche during the revolution and hostilities of those years, when he says, Major Reading had hardly time to do so, as he was nearly all the time required by me to do service. Sutter had said before, in his answer to another question, that he had been, in the years 1844–1846, military commandant of the northern frontier of California, and was also charged with the civil jurisdiction in all that region of country; and, as such, that he had official power to order Reading upon military duty, and that he had done so. It appears also from his testimony, that he kept Reading so employed in the service of Mexico, with the exception of short intervals, from the early part of the spring of 1845 into a part of the year 1846, until Col. Frémont invaded Upper California, when, shortly afterwards, Reading joined him. The facts of the case, in respect to the occupation and cultivation of the land by Reading's agent, disprove the objection. Such an agency for building a house, and having it inhabited by the agent, was as good a compliance with the condition requiring that to be done, as if it had been done personally by Reading. The objection, that he had disregarded the condition of the grant, in not having obtained judicial possession and a survey of the land, is answered by the declaration of Sutter, the only person officially authorized to give it, and without whose permission no survey could have been made. He says, that Reading applied to him in the spring of the year 1845, to be put in judicial possession of the land, but that he had not complied, because his military engagements in the field against the Indians, just before and following the application, had disabled him from doing so; and that the revolution which followed Col. Frémont's coming was his reason for not having given to Read-

1 *

ing judicial possession, according to the prayer of his petition for that purpose.

We have noticed these minor objections against the confirmation of this grant, that the real merits of the transaction might be known, and not because it was essential to the decision of the case. For, even if the proofs in the case, in respect to the grantee's occupancy of the land, had been otherwise than they have been shown to have been, his title to it would not have been lost, because the conditions annexed to the grant had not been fulfilled; unless it could be shown that there had been on his part such unreasonable delay or want of effort to fulfil those conditions as would amount to an intention " to abandon his claim " before the Mexican power had ceased to exist, and that he was now endeavoring to resume it, from its enhanced value under the government of the United States. This court, considering, in Frémont's case, 17 How. 560, the same objections which are now under our consideration in this, uses the following language : " Regarding the grant to Alvarado, therefore, as having given him a vested interest in the quantity of land therein specified, we proceed to inquire whether there was any breach of the conditions annexed to it, during the continuance of the Mexican authorities, which forfeited his right, and revested the title in the government. The main objection on this ground is the omission to take possession, to have the land surveyed, and to build a house on it within the time limited in the conditions. It is a sufficient answer to this objection to say, that negligence in respect to these conditions and others annexed to the grant, does not, of itself, always forfeit the right of the grantee."

" It subjects the land to be denounced by another, but the conditions do not declare the land forfeited to the State upon the failure of the grantee to perform them. The chief objects of these grants was to colonize and settle the vacant lands. The grants were usually made for that purpose, without any other consideration and without any claim of the grantee on the bounty or justice of the government. But the public had no interest in forfeiting them, even in these cases, unless some other person desired and was ready to occupy them, and thus carry out the policy of extending its settlements. They seem to have been intended to stimulate the grantee to prompt action in settling and colonizing the land, by making it open to appropriation by others in case of his failure to perform them. But, as between him and the government, there is nothing in the language of the conditions, taking them altogether, nor in their evident object and policy, which would justify the court in declaring the land forfeited to the government, where no other person sought to appropriate them, and

their performance had not been unreasonably delayed. Nor do we find anything in the practice and usages of the Mexican tribunals, as far as we can ascertain, that would lead to a contrary conclusion."

It was also urged, that no title passed by the grant, as it had not received the approval of the departmental assembly. Our examination of the decrees of the 18th of August, 1824, and of the 21st of November, 1828, leads us to a different result. A right and title passed by the governor's grant, but its definitive validity was suspended for the approval of the assembly; and so it continued to be suspended, until its approbation had been given, when the title became definitive. But if that was refused, it did not take away, nor in any way qualify, the grantee's title, but only kept its final validity in suspense until the grant had been rejected by the supreme government of the republic; it being the duty of the governor, after its rejection by the assembly, to forward the documents of title to the supreme government for its decision.

Further, we must infer from the same decrees, and particularly from the 5th article of that of the 21st of November, 1828, that it was the duty of the governor, and not that of the grantee, to forward grants of land given by him to the departmental assembly. The latter might very well, after that had been done by the governor, solicit the approval of the assembly, personally or by an agent, by all those considerations which had gained him the governor's favor. But if the governor failed to transmit the documents, from any cause whatever, the grantee's title continued to be just what it was when the grant was given. Nor could any neglect or refusal of the governor to transmit his grantee's documents of title to the assembly take from him his right in the land, if the grant had been made with a due regard to what the decree of the 18th of August, 1824, required, and in conformity with the cautionary regulations of that of the 21st of November, 1828. In other words, from our reading of those decrees, the governor could not either directly recall a grant made by him, or indirectly nullify it when it had been conferred conformably with them. Those decrees prescribe a course of action for such grants, and impose upon the governor the execution of it. When, then, the archives of the Territory of the Californias do not show that the governor's grants of land had been sent to the departmental assembly; or that, having been sent, they had been rejected, and that after such rejection they had not been sent, by the governor making the grants, to the supreme executive government for its final decision—the titles of the grantees are just what they were in their beginnings, and are sufficient, now that the territory has been transferred to

the United States, for confirmation under its statute of the 3d of March, 1851. Such grants, so circumstanced, are equitable titles, protected by the treaty of Guadalupe Hidalgo, and by the laws and usages of nations concerning the rights of property, real and personal, of the inhabitants of a ceded or conquered country. And, we may add, they are protected by the usages of Mexico in respect to such grants, the archives of California showing that a very large portion of the land in the occupation of its inhabitants was held by titles wanting the approval of the departmental assembly. And we entirely concur with Mr. Commissioner Hall, in the opinion given by him in the case, that the want of such approval in so many instances, as are shown by the archives of the territory, was owing to the fact that the political affairs of the territory had been in confusion for several years preceding its cession to the United States. That the assembly had seldom been called together, and when assembled its sessions had been brief, and occupied with the consideration of pressing matters of a public character; and that the governors making grants had very much neglected to present them to the assembly for approval. We are of the opinion that Reading's right to a confirmation of his grant cannot be refused on account of its not having had the approval of the departmental assembly.

We will now dispose of the objections to a confirmation of this grant, connected with Reading's national status, when he received his documentary title, and with his having subsequently joined the forces of the United States in the war with Mexico. It is said he was not a naturalized citizen of the Mexican republic when the grant was conferred, and that, if he was, his title was forfeited to Mexico, for having fought against her; and, if not forfeited, that his course in that particular should be taken as full proof of his intention to abandon all right and title to the land.

The case, as it is made in the record, does not require from us a particular consideration of the circumstances under which foreigners might receive and retain grants of land, by the decrees of 1824 and 1828. It is enough to say, that the Mexican republic, from the time of its emancipation from Spain, always dealt most liberally with foreigners in its anxiety to colonize its vacant lands. It invited them to settle upon her territory, by promises of protection of them and their property. And, by the first article of the decree of 1828, for colonizing her vacant lands, foreigners were included with those to whom the governors of the territories might make grants of land for the purpose of cultivating and inhabiting them.

But the fact of Reading's Mexican naturalization is not an

open question in this case. The record admits the regularity and genuineness of his documentary title for the land. The admission is as good for all of the necessary recitals in them, as it is for the main purpose for which they were inserted in those documents. That was a grant of the land. The recitals are those "requisite conditions," stated in the second and third paragraphs of the decree of November 21, 1828, concerning which, the gr̥ernor is enjoined to seek for information, which, when affirmatively ascertained, make the foundation for the governor's exercise of his power to grant vacant lands.

In his petition for a grant, Reading says he is a native of the United States, and had resided in the country since the year 1842. The governor states him to be a Mexican by naturalization, in the grant, and "that as the proper proceedings and investigations had been previously complied with, according to the provisions and laws and regulations concerning the matter," he, in virtue of the authority vested in him, grants to the petitioner the land known as Buena Ventura, on the margin of the River Sacramento, from the creek called Lodo, (Lodoso, Muddy,) which is on the north as far as the Island de Sangre, with six square leagues in extent, subject to the approval of the departmental assembly, and on the conditions annexed to the grant. Now, this is not merely the language of clerical formality, though it might be the same from usage in like cases, but it is a declaration of the governor's official and judicial conscience; that his power to make the grant has been used in a fit case, for the approval of it by the departmental assembly, or for the decision of the supreme executive government, in case the action of the assembly should make it necessary for him to carry it there for its decision.

We consider it conclusive of the fact of the petitioner's Mexican naturalization, precluding all other inquiries about it, in our consideration of this case, by the record.

The last objection was that Major Reading having joined the forces of the United States in the war with Mexico, had forfeited his right to the approval of his grant by the authorities of Mexico, which the United States might take advantage of to defeat his claim; and, if not so, that the fact itself raised a strong presumption that he meant to abandon it. As to the last, there is nothing in the record from which such an intention can be inferred, and the fact itself is insufficient for such a purpose. There is much to show the reverse, if the circumstances and condition of the country are considered, when Reading joined Col. Frémont. There had been in the year 1845 a successful revolution in California, by which Torena, the governor, had been deposed; his powers had been assumed by Colonel Don

José Castro, without any authority from the supreme executive government of Mexico. It was followed by Indian outbreaks, with marked hostility to the foreigners who had settled in California, and more so against those from the United States than to any other class. If they were not instigated, they certainly were not discouraged by the existing government. Its conduct indicated its wishes, if not a fixed design, to drive the naturalized immigrants from the United States from their homes and from the territory. In such a state of things, Col. Frémont carried the war into California. Neither the supreme government, nor the territorial, gave protection to its inhabitants, and it had become part of the war policy of Mexico to suspect the fidelity of settlers from the United States to their Mexican allegiance, and plans were formed to get rid of them. We take the fact from other authentic sources, and Sutter speaks of it in the record, with positiveness as to himself. Reading had good cause for like apprehensions, and having joined Col. Frémont under such circumstances, his conduct may be said to have been blameless of all treachery to Mexico.*

But if they were otherwise, and Reading had voluntarily, and without circumstances to excuse it, abandoned his Mexican allegiance for that of his nativity, the United States could not urge it as a cause for the forfeiture of his title to land acquired from Mexican laws, and in the mode in which those laws had been executed by the governors of the states and territories of that republic.

War has its incidents and rights for persons and for nations, unlike any that can occur in a time of peace, and they make the law applicable to them. One of them is, that by the law of war either party to it may receive and list among his troops such as quit the other, unless there has been a previous stipulation that they shall not be received. But when they have been received, a high moral faith and irrevocable honor, sanctioned by the usages of all nations, gives to them protection personally, and security for all that they have or may possess. They are exempt also from all reproach from the sovereignty to which their services have been rendered. Nothing that they claim as their own can be taken from them, upon the imputation that they had forfeited or meant to relinquish it by the abandonment of their allegiance to the sovereignty which they had left.

The reverse would partake of Sir Guy Carleton's " impossible infamy," † though when used by him in reply to a letter from

---

* See Senate Document, report by General Cass, of 23d of February, 1848, on California claims.   Statement of Samuel I. Hensley, Richard Owens, and deposition of Wm. N. Lokes.
† Col. Benton's Thirty Years' View, vol. i. p. 90.

General Washington, not so well applied, as it might be, if the United States was allowed to interpret the treaty of Guadalupe Hidalgo, so as to take for itself Reading's land, because he had joined its forces in the war with Mexico.

Having considered every objection made to the confirmation of this grant, and believing no one available for such a purpose, it only remains for us to declare our affirmance of the award of the commissioners, and the decree of the district court.

Mr. Justice DANIEL dissented.

Mr. Justice CATRON.

I agree that the grant to Major Reading describes the land he applied for so that it can be ascertained and surveyed; and secondly, that he took possession and built a house on it within a year after the execution of the grant, in compliance with its material condition, and that the judgments of the board of commissioners, and of the district court of California, were proper. But there are no facts in the case on which any question can be raised, whether the grantee, Reading, was subject to be denounced for failing to take possession and building a house; and therefore I cannot agree that the doctrine should be introduced into the opinion here, as it may embarrass the court in other cases in which the question will properly arise.

Nor can I be committed to the assumption extracted from the Frémont case, and sought to be sanctioned in the principal opinion, that a Spanish concession, authorizing the grantee to occupy and cultivate, is indefeasible in its operation, although the land was never possessed nor occupied, unless some person shall denounce the land as forfeited, and obtain a second concession for it from the governor. The assumption signifies that every incipient concession made by Mexican authority secured the land to the claimant without the performance of any one condition; that the claimant is only bound to prove that the concession was signed by a person holding the office of governor at the time; or, in other words, that the grant was not forged. How ruinous such an assertion may eventually prove in the cases of old and abandoned claims is quite manifest, as it must apply in all cases where the same land is covered by different grants; the oldest will of course be the better title, unless the younger grantee can show that the land had been denounced, and the first grant revoked by the authority that made it. When such a case is presented, and we are called on to consider this doctrine of a "denouncement," I wish to be free to do so, unaffected by previous assertions and *dicta* in cases that did not involve the question, and in which it was never considered by me.

That the Frémont case did not involve the doctrine is manifest; it was a floating claim for 50,000 arpens of land, subject to be located by selection and survey in any part of a large section of country bounded by rivers and mountains; and the opinion of this court was, that Alvarado took, and Col. Frémont held, as assignee of Alvarado, a pervading interest in the entire section of country, and that the land might be taken anywhere within it, so that the rights of others were not disturbed. The rule is, so far as I know, throughout the former dominions of Spain on this continent, where donations of land have been made for the purposes of cultivation or pasturage, and where the donations imposed the condition that the grantee should occupy and cultivate the land, and he failed to do so or abandoned it, that the claim under it was defeated.

It is assumed that the Frémont claim stood on the footing of that of General Greene, for 25,000 acres derived from North Carolina, to be located and surveyed within the military district by commissioners designated for that purpose.

General Greene's grant, in effect, was a floating claim, just such an interest in the lands as was reserved for the officers and soldiers of the North Carolina line, by virtue of warrants issued to them, and which might be located in a land-office in any part of the military district. This is the doctrine held by the courts of Tennessee, where the land lies, in reference to General Greene's grant, and the interest that warrant holders had in common with General Greene, as will be seen by the case of Neal *v.* E. T. College, 6 Yerger, 190.

General Greene acquired no specific land; he acquired by the act of the legislature a promise of the specified quantity, to be ascertained by a subsequent survey and allotment. And this was the condition of the Frémont title, as this court decided.

Now, how was it possible for any one to apply to a Mexican governor, and ask for Alvarado's land, because he did not inhabit or cultivate it, or because he had abandoned it? He never had any land; he only had a promise of land, or a common interest in a large tract of country; and the idea of any one denouncing a holder of this floating claim, and asking for the particular land it covered, would have been unmeaning and idle.

The Frémont case, therefore, furnished no grounds for raising or deciding the question of denouncement, and the repeal of the first grant and of re-grant to another. What is now claimed for the opinion in that case, as part of the court's legitimate decision, can only be treated as an assertion, and as part of the reasoning of the court in coming to a conclusion on other questions involved in the controversy.

Cases of denouncement in advance of a second grant for the

same land are unknown in California, so far as we are advised; and the result of holding this proceeding necessary before a second grant could be made, (although no survey of the first had been secured, nor any possession taken,) must result in the conclusion that, among several concessions for the same land, the oldest will hold it; and those in possession under younger grants must yield the possession. This is the common-law doctrine on which the Frémont case is supposed to have been decided. But is this the true rule as regards double grants, according to the Spanish law, as administered in countries formerly owned and governed by Spain?

The law has been established in Louisiana for nearly forty years, that where the Spanish authorities have granted the same land twice, and the younger grantee has taken possession and performed the conditions of inhabitation and cultivation, he is entitled to hold the land; and this was held in contests between the first and second grantees, and in cases where no denouncement had been made in favor of the younger grantee. Boissier et al. v. Metayer, 5 Mar. R. 678, (1818;) Gonsanlier's Heirs v. Brashear, 5 Martin's N. S. 33; Baker v. Thomas, 2 Louisiana R. 634; Brossard v. Gonsanlier, 12 Robinson's R. 1.

The correctness of these decisions I have never doubted, and they have been substantially followed by this court, when it held, as it has often done, that a concession or first decree for land, over which no ownership was exercised or possession taken during the existence of the Spanish government, was inoperative, and imposed no obligation on the United States to confirm the title. It was so held in the case of The United States v. Boisdoré, 11 How. 96, which has been followed in various other cases since.

With this explanation, I concur in the affirmance of the judgment.

Mr. Justice CAMPBELL. I concur.

Mr. Justice DANIEL, dissenting.

I am unable to concur in the decision of the court in this case.

Waiving in its consideration every exception to the proofs of the naturalization of the appellee, and those also taken to the locality of the subject claimed by him as being forbidden territory, there are other grounds of objection which appear to be conclusive against the pretensions of the appellee.

This was an application to the board of commissioners, for the confirmation of a grant or title alleged to have been made to the appellee by the Mexican government, anterior to the cession of

California to the United States. To entitle the applicant to such confirmation, it was indispensable for him to show that he occupied such a position with respect to the Mexican government as would have enabled him to perfect his title, had there been no relinquishment of the sovereignty of the country by the granting power. It cannot be denied, that a necessary ingredient in a complete title under the Mexican government, was the approbation of the departmental assembly; and the very act itself of the application to the commissioners for a confirmation of title concedes the position, that without such an approval the title must be defective. I cannot concur with the court in thinking that the excuse offered for not obtaining the approbation of the departmental assembly, was a sufficient one; and much less can I suppose that, by such an excuse, an indispensable requisite to the completion of titles could be wholly dispensed with. To tolerate such a position, would render the validity of titles to any and every extent dependent upon the ignorance, the diligence, or the corruption of persons interested in reducing them to such an attitude of uncertainty. Even should it be admitted that there was no particular limit prescribed as to the time of obtaining the sanction of the departmental assembly, and that the appellee might have been excusable for omitting or failing in this requisite, for the time being, still, the conclusion remains unshaken, that, without such approbation, there could by the law of Mexico be no title. If this be true, the objection operates *à multo fortiori* if it be shown that not only was that requisite of approbation wanted, but that its obtention was, by the conduct of the appellee himself, rendered impossible; and under this aspect of the case is presented the stronger ground upon which the claim of the appellee should have been condemned and rejected. This is an application for the confirmation of a grant or title alleged to have been made by the Mexican government to the appellee, as one of the citizens of the Mexican republic.

In order to have invested the appellee with any right as derived from that republic, had its sovereignty over the country remained unchanged, he surely would have been bound to show the continuation of his allegiance to that republic, and the maintenance of those relations, and the fulfilment of those duties, in the existence of which the bounty of the State to him had its origin and motive; at all events, he would be compelled to show himself exempt from the violation of the most sacred obligations which any citizen or subject can sustain to that country and government to which his allegiance is owing. Should he violate such obligation, and become a rebel or traitor to that government, he not only can have no merits in the view of that gov-

ernment, but he becomes obnoxious to the forfeiture of both property and life.

In this case, the appellee seeks the confirmation of a claim derived confessedly from the republic of Mexico; at the same time, by his own showing, and by the testimony of others, it is established undeniably, that before his title was perfected, he became a rebel against that republic, and made every exertion for its destruction. Nay, this case exhibits the inconsistency of urging a right founded on duties sustained to the Mexican republic, with the assumption at the same time of merit deduced from the admitted facts of hostility and faithlessness to that government. The appellee can have no rights to be claimed from or through the Mexican government, to which he became an open enemy. By his conduct he completely abrogated every such right, and became, as respects that government, punishable as a state criminal; and thus not only failed to obtain that sanction without which his title was defective, namely, the approbation of the departmental assembly of Mexico, but, by his own voluntary conduct, rendered its procurement, upon every principle of public law, public or political policy or necessity, or of private morality, altogether impossible.

Were the appellee urging a claim as one deduced from the government of the United States, and originating in services rendered to them, he might then plead his merits with reference to this government in support of his title; but he is claiming a title from Mexico under the stress of Mexican laws; and he proves that by those laws, as they would be under like circumstances by the laws of every country—by the first of all laws, that of self-preservation—his pretensions must be repudiated and condemned. Strange as it may be, we have heard it earnestly pressed as commending this claim to the favorable consideration of this court, that the appellee, after obtaining his incipient grant as a Mexican citizen, and upon the foundation and principles of duty to Mexico, deserted that country when in flagrant war with an enemy, and contributed his utmost exertions for her conquest by that enemy. Were the pretensions of the appellee based upon services rendered to the United States, and were the origin and character of these pretensions to be sought for in the bounty and power of the United States, there might be consistency and integrity in this argument; but so far is this from being true as to the origin and nature of these pretensions, it is shown that these had their origin in that bounty which he has forfeited, and under those obligations which were binding upon the appellee, and which he has deserted and betrayed. The only obligations sustained by the United States to the citizens of Mexico are those which, by their substitution for the government of Mexico,

the former have by express stipulation or by necessary implication assumed.

The appellee, then, having unquestionably forfeited every pretension of right as against Mexico, deserted and assailed by him, the United States, as the successors to the sovereignty of Mexico, can sustain no obligation with respect to him in connection with this claim. I think, therefore, that the decision of the court below should be reversed, and petition of the appellee dismissed.