GATES *v.* GOODLOE.

1. Where the defendant in error moved to dismiss a writ sued out by three partners, two of whom had previously received their discharges in bankruptcy, on the ground that the assignee alone could prosecute it, the court grants the application of the latter to be substituted as a plaintiff in error.

2. *Semble,* that the partner against whom no bankruptcy proceedings were instituted might have sued out the writ, using, if necessary, the names of all the parties against whom the judgment had been rendered.

3. The court reaffirms the ruling in *The William Bagaley* (5 Wall. 377), that a resident of a section in rebellion should leave it as soon as practicable, and adhere to the regular established government; and furthermore holds that one who, abandoning his home, enters the military lines of the enemy, and is in sympathy and co-operation with those who strive by armed force to overthrow the Union, is, during his stay there, an enemy of the government, and liable to be treated as such, both as to his person and property.

4. When in 1862, at a time when there was no such substantial, complete, and permanent military occupation and control of Memphis as has been held

sometimes to draw after it a full measure of protection to persons and property, and when no pledge had been given which would prevent the general commanding the forces of the United States from doing what the laws of war authorized, and his personal judgment sanctioned, as necessary for and conducive to the successful prosecution of the war, — *Held*, that he had the right to collect rents belonging to a citizen who had gone and remained within the lines of the enemy, and hold them subject to such disposition as might thereafter be made of them by the decisions of the proper tribunals.

5. A lessee who was dispossessed by the military authorities under such circumstances and deprived of the use and control of the demised premises, is discharged from liability to his lessor for rent accruing during the period of such dispossession.

ERROR to the Supreme Court of the State of Tennessee. The facts are stated in the opinion of the court.

*Mr. Luke W. Finlay* for the plaintiffs in error.
*Mr. Joseph B. Heiskell, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

The original decree in the second Chancery Court of Shelby County, Tennessee, for $8,821.49, was rendered against S. M. Gates, A. M. Wood, and Milton McKnight, partners under the name of Gates, Wood, & McKnight, and on appeal to the Supreme Court of Tennessee, it was, to the extent of $7,840.25, affirmed Oct. 13, 1875. On the 1st of August, 1876, Gates and Wood received discharges in bankruptcy, releasing them individually from all provable debts and claims existing against them on the 22d of April, 1876, other than those which, by law, were excepted from the operation of such a discharge. The present writ of error was sued out Oct. 30, 1876, by all the partners. The defendant in error now moves to dismiss it, upon the assumption that the assignee in bankruptcy could alone prosecute it. Undoubtedly, the assignee had the right to prosecute that writ, so far, at least, as it concerned those whom he represented. If the bankrupts could not themselves, under any circumstances, properly sue it out after their discharge (and upon that question we express no opinion), all difficulty, in that respect, has been removed by the application of the assignee for an order here substituting him as a plaintiff in error. His application is now granted, and he is allowed to prosecute the writ in behalf of the bankrupts. Independently, however, of that

application, we are not prepared to say that McKnight, the partner against whom no bankruptcy proceedings were instituted, might not have sued out the writ, using for that purpose, if necessary, the names of all the parties against whom the original decree was rendered. With both the assignee in bankruptcy and McKnight before the court, there is no sound reason why the cause should not proceed to a final determination upon the errors assigned.

Coming, then, to the merits of the case, we find that the original plaintiffs in error specially claimed a right or immunity in virtue of an authority exercised under the United States. The right or immunity, so claimed, was denied, first in the court in which the suit originated, and subsequently in the Supreme Court of the State of Tennessee.

The facts upon which that claim rests, or out of which it arises, are, briefly, these : —

On the 6th of June, 1862, military possession was taken of the city of Memphis by the Union forces then engaged in suppressing armed insurrection against the national authority. During the succeeding month General Sherman, having been previously assigned by competent military authority to the command of the district of West Tennessee, reached that city with reinforcements, and assumed control of the forces in that locality.

Shortly thereafter he published orders, reopening trade and communication with the surrounding country, and prescribing rules in conformity with which travel in and out of the city should be conducted. On the 7th of August, 1862, pursuant to orders from General Grant, his superior officer, specific instructions were issued by him to the quartermaster in charge at Memphis, concerning vacant stores and houses in that city, and also as to buildings which were occupied, but the owners of which had " gone South," leaving agents to collect rent for their benefit. With reference to the latter class of buildings his instructions, or rather orders, were : " Rent must be paid to the quartermaster. No agent can collect and remit money South without subjecting himself to arrest and trial for aiding and abetting the public enemy."

The object of these regulations was thus distinctly set forth by General Sherman in his letter of instructions : " I under-

stand that General Grant takes the rents and profits of this class of real property, under the rules and laws of war, and not under the Confiscation Act of Congress; therefore the question of title is not involved, — simply the possession, and the rents and profits of houses belonging to our enemies, which are not vacant, we hold in trust for them, or the government, according to the future decision of the proper tribunals." He concluded his letter in these words: " We have nothing to do with confiscation. We only deal with possession, and, therefore, the necessity of a strict accountability, because the United States assumes the place of trustee, and must account to the rightful owner for his property, rents, and profits. In due season courts will be established to execute the laws, the Confiscation Act included, when we will be relieved of this duty and trust. Until that time every opportunity should be given to the wavering and disloyal to return to their allegiance to the Constitution of their birth or adoption."

These instructions do not appear in the present transcript, although they constitute a part of the archives of the War Department, and belong to the public history of the late civil war. Some question may be made as to our right to take judicial notice of them in the determination of this case. But, apart from them, the record sufficiently establishes the fact that the military authorities adopted the general policy indicated by General Sherman's letter of instructions, and a rental agent, designated by those authorities, was charged with the duty, among others, of collecting rents of houses which, although occupied, belonged to persons who had " gone South." To that class of property belonged a storehouse, occupied by Gates, Wood, & McKnight, under a lease executed at Memphis, in 1859, by R. C. Brinkley, the testator of defendant in error, for a term of five years, and for the stipulated rent of which the lessees had executed their several promissory notes, payable quarterly during the whole period of the lease. Brinkley, upon the approach of the Union forces, left his home in Memphis, and went within the lines of the Confederate forces, where he remained until 1864.

Gates, Wood, & McKnight were notified by the military rental agent, in the summer of 1862, to pay him the rents going

to Brinkley. They refused to recognize that order, or to so pay the rents, and, by reason of such refusal, were dispossessed by the military authorities. Those of their sub-tenants who expressed a willingness to comply with the order were permitted to remain in the occupancy of the premises, paying rent, however, directly to the rental agent of the United States. From the time the lessees were thus dispossessed, until July 11, 1863, the property remained under Federal military control, and all rents arising therefrom were collected by the rental agent, who, in the exercise of his functions, was recognized and sustained by the general commanding the Union forces in that district. During that intermediate period the lessees were neither in possession of the premises, nor permitted by the military authorities to receive any rents accruing therefrom. Their rent notes, covering the period during which they were thus kept out of possession, remained, however, outstanding, in the hands of the lessor or his agent. They constitute the foundation of the judgment or decree in this suit.

Are the lessees liable to the estate of Brinkley for rent, as stipulated in the lease of 1859, for the period when the storehouse was under control of the Federal military? There is no claim here for rents subsequent to July 11, 1863, since, on that day, possession was delivered or control surrendered to the lessor's son, under an arrangement made by him with the military authorities. After the return of the lessor to Memphis, in 1864, the latter took control of the property, and enjoyed the rents. Upon the solution of the foregoing question this case depends.

The Supreme Court of Tennessee was of opinion that the lessees were not discharged from liability upon their contract with Brinkley, by reason of the action taken by the military authorities touching the rents accruing from the property in question. That court recognized the hardship of the case upon the lessees, but consistently with its views of the law the relief asked for could not be given.

We are unable to give our assent to the conclusion reached by that learned court. It is inconsistent with our decision in *Harrison* v. *Myers* (92 U. S. 111), where we held that the lessee was discharged from liability to the lessor for rent of certain

property in New Orleans during the period when the rents and profits arising therefrom were required by the Federal military authorities, occupying and controlling that city in the year 1862, to be paid directly to them.    There is some difference in the facts of the two cases, but in their essential features they are alike.    That case, it may be here observed, was determined in this court after the rendition of the present decree by the Supreme Court of Tennessee.

Brinkley, in his answer, claims to have gone within the insurrectionary lines as a private citizen and upon private business.    He testified that he "never had the honor to go or act in any other capacity, then, before, or since."    It was, however, shown that in 1861 he became a member of a military board organized in hostility to the United States.    It does not appear when his connection with that body terminated, or when the board itself ceased operations.    But it does appear from his own admissions that he had, prior to the occupation of Memphis by the Union forces, contributed money towards the equipment of military companies organized in that State with the avowed purpose of resisting the authority of the national government. When he abandoned his home, and entered the military lines of the enemy, he was, beyond question, in full sympathy and active co-operation with those who sought, by armed force, to overthrow the Union.    Neither in his answer nor in his deposition does he intimate that he had any sympathy with the United States in its efforts to suppress insurrection.    He was, therefore, in the very fullest legal sense, an enemy of the government during his stay within the military lines of the rebellion, liable to be treated as such both as to his person and property.    His remaining there was in plain violation of law and in disregard of duty.    In *The William Bagaley* (5 Wall. 377), we said that "it was the duty of a citizen when war breaks out, if it be a foreign war and he is abroad, to return without delay ; and if it be a civil war, and he is a resident in the rebellious section, he should leave it as soon as practicable, and adhere to the regular established government."

The general commanding the Union forces at Memphis was charged with the duty of suppressing rebellion by all the means which the usages of modern warfare permitted.    To that end

he represented for the time, and in that locality, the military power of the nation. He did not assume authority to confiscate Brinkley's rents, nor did he seize them as booty of war; but, by his subordinates, collected and held them subject to such disposition as might be thereafter made of them by the decisions of the proper tribunals. They were seized, *flagrante bello*, in that portion of the territory of the United States the inhabitants whereof had been declared to be in insurrection. There was no such "substantial, complete, and permanent military occupation and control" as has been sometimes held to draw after it a full measure of protection to persons and property at the place of military operations. 16 Wall. 495. No pledge had then been given by the constituted authorities of the government which prevented the commander of the Union forces from doing all that the laws of war authorized, and that, in his judgment, under the circumstances attending his situation, was necessary or conducive to the successful prosecution of the war. He was not bound to risk the possibility of Brinkley's rents being transmitted to him beyond the Union lines. To have permitted the latter to enjoy the benefit of them in any form during his voluntary absence within the military lines of the insurrection might have encouraged him to remain under the protection of the enemy, adding by his presence and means to the enemy's ability to continue the struggle against the government. If, therefore, in the judgment of the commanding general, the security of his own army, or the diminution of the enemy's resources, required that he should prevent those within the Confederate military lines from receiving or using in any way, while there, rents accruing from real estate within the Federal lines, it would be difficult to show that the mode adopted by him to effect that result was not a proper military precaution, entirely consistent with the established rules of war, and having direct connection with the great end sought to be accomplished by the war; to wit, the destruction of armed rebellion, and the complete restoration of the national authority over the insurrectionary district.

The action of the military authorities in seizing the rents arising from the property which Brinkley had leased to Gates, Wood & McKnight not being, then, in violation of law, — that

which was done being regarded as having been done by the authority of the United States in lawful defence of the national existence against armed insurrection, — it results, necessarily, as we think, that the lessees, when dispossessed by military authority and deprived of all future use and control of the leased property, were discharged from liability to the lessors for rent accruing during, at least, the period of such dispossession. They were not discharged from liability for rent which had previously accrued. But, since the consideration for their promise to pay rent, from time to time, was the possession and use of the leased property during the term and upon the conditions specified in the lease, and since such enjoyment and use were materially interrupted and prevented by the interference of the law, or of lawful public authority, to which both parties were amenable, the lessees, it seems to the court, ought to be protected against liability for the rent stipulated in the contract of 1859, for the period they were thus kept out of possession and enjoyment of the property. The events and contingencies causing that result were not such as the parties anticipated, nor such as we can suppose were in contemplation when the contract was made. Otherwise they would, it must be assumed, have been provided for in the contract.

The conclusion thus reached is abundantly sustained by authority. Indeed, many of the authorities would justify us in holding the action of the military authorities to have worked the dissolution of the entire contract of lease from the moment the lessees were dispossessed.

In *Melville* v. *De Wolf* (4 El. & Bl. 844), the plaintiff sued for wages agreed to be paid to him as a mariner and carpenter on board of a foreign ship going to the Pacific Ocean. In the course of the voyage complaint was made to a British consul, at a foreign port, of an offence alleged to have been committed by the master of the ship. The consul, in pursuance of a British statute, and having power and jurisdiction so to do, caused the master to be conveyed to England, under restraint, to be there proceeded against in respect of the offence charged; and the consul, having power and jurisdiction so to do, caused the plaintiff to leave the ship, and proceed to England as a witness. The latter did not return to the ship, or render any further

services thereon for the defendant. The question in the case was as to the liability of the defendant for wages according to the articles signed, for the period subsequent to the departure of the plaintiff for England under the direction or order of the consul. The Court of Queen's Bench, speaking by Lord Campbell, C. J., said: "The money paid into court covered the plaintiff's demand for wages during the whole time that he had served on board the ship; and we think that, upon the facts proved, the ship-owners were not liable to pay him wages for a longer period. By authority of the British legislature he was then separated from the ship at a foreign port and sent to England, without any reasonable possibility of his ever being able to rejoin the ship during the voyage in which he was engaged. No blame is to be imputed to him, and there has been no forfeiture of wages; but he cannot be considered as having earned the wages in dispute. After he was sent home from Montevideo to England, he neither served under the articles actually or constructively; and as from that time the relation of employer and employed could not be renewed within the scope of the original hiring, we think that the contract must then be considered as dissolved by the supreme authority of the State, which is binding on both parties." Again: "Then, an act being done by public authority, which rendered any further performance of the contract impossible, we think that the contract was dissolved."

*Exposito* v. *Bowden* (7 id. 763) has some bearing upon the question. Bowden, a British subject, contracted to make a voyage to Odessa, a Russian port, and bring from there goods belonging to the other contracting party. Before the voyage was completed, war between England and Russia intervened. Bowden thereupon declined to execute the contract, and was sued for damages for failing to do so. The Court of Queen's Bench said: "As to the mode of operation of war upon contracts of affreightment made before, but which remain unexecuted at the time it is declared, and of which it makes the further execution unlawful and impossible, the authorities establish that the effect is to dissolve the contract, and to so absolve both parties from further performance of it."

The same doctrine was announced in *Barker* v. *Hodgson*

(3 Moo. & S. 267), where Lord Ellenborough said: "If, indeed, the performance of this covenant has been rendered unlawful by the government of this country, the contract would have been dissolved on both sides, and this defendant, inasmuch as he has thus been compelled to abandon his contract, would have been excused for the non-performance of it, and not liable in damages."

In his treatise on the law relative to merchant ships and shipping (11th ed., by Shee, 453), Lord Tenterden says: "If an agreement be made to do an act lawful at the time of such agreement, but afterwards, and before the performance of the act, the performance be rendered unlawful by the government of the country, the agreement is absolutely dissolved."

To the same effect speak Chancellor Kent (3 Kent, 248) and Mr. Chitty. Chit. Contr. (11th Am. ed.) 1077. The last-named author says: "So the non-performance of a contract will be excused where such non-performance is occasioned by an act done by public authority."

Further citation of authorities would seem to be unnecessary. The reasons assigned in the adjudged cases, and by elementary writers, in support of the principles announced in the foregoing authorities, apply to this case, and should control its determination. The lessees having been permanently deprived, by competent public authority, of the possession of the leased property, the use of which was the sole consideration for the notes sued on, they were discharged from liability upon the notes, which represented the rents accruing during the period of military occupancy and control.

The decree of the Supreme Court of Tennessee will be reversed, with directions to enter, or to cause to be entered in the proper court, a decree of perpetual injunction in accordance with the principles of this opinion; and it is

*So ordered.*