317 U.S. 1
 63 S.Ct. 2
 87 L.Ed. 3
 87 L.Ed. 7
 Ex parte QUIRIN. Ex parte HAUPT. Ex parte KERLING. Ex parte BURGER. Ex parte HEINCK. Ex parte THIEL. Ex parte NEUBAUER. UNITED STATES ex rel. QUIRIN
v.
COX, Brig. Gen., U.S.A., Provost Marshal of the Military District of Washington, and 6 other cases.
 Nos. —- Original and Nos. 1, 2, 3, 4, 5, 6 and 7—July Special
 Term, 1942.
 Argued July 29, 30, 1942.
 Decided July 31, 1942.
 Extended opinion filed Oct. 29, 1942.
 
 [Syllabus from pages 1-6 intentionally omitted]
 Colonel Kenneth C. Royall, of Raleigh, N.C., for petitioners.
 [Argument of Counsel from pages 6-11 intentionally omitted]
 Mr. Francis B. Biddle, Atty. Gen., for respondent.
 PER CURIAM.
 
 
 1
 In these causes motions for leave to file petitions for habeas corpus were presented to the United States District Court for the District of Columbia, which entered orders denying the motions. Motions for leave to file petitions for habeas corpus were then presented to this Court, and the merits of the applications were fully argued at the Special Term of Court convened on July 29, 1942. Counsel for petitioners subsequently filed a notice of appeal from the order of the District Court to the United States Court of Appeals for the District of Columbia, and they have perfected their appeals to that court. They have presented to this Court petitions for writs of certiorari before judgment of the United States Court of Appeals for the District of Columbia, pursuant to 28 U.S.C. § 347(a), 28 U.S.C.A. § 347(a). The petitions are granted. In accordance with the stipulation between counsel for petitioners and for the respondent, the papers filed and argument had in connection with the applications for leave to file petitions for habeas corpus are made applicable to the certiorari proceedings.
 
 
 2
 The Court has fully considered the questions raised in these cases and thoroughly argued at the bar, and has reached its conclusion upon them. It now announces its decision and enters its judgment in each case, in advance of the preparation of a full opinion which necessarily will require a considerable period of time for its preparation and which, when prepared, will be filed with the Clerk.
 
 The Court holds:
 
 3
 (1) That the charges preferred against petitioners on which they are being tried by military commission appointed by the order of the President of July 2, 1942, allege an offense or offenses which the President is authorized to order tried before a military commission.
 
 
 4
 (2) That the military commission was lawfully constituted.
 
 
 5
 (3) That petitioners are held in lawful custody, for trial before the military commission, and have not shown cause for being discharged by writ of habeas corpus.
 
 
 6
 The motions for leave to file petitions for writs of habeas corpus are denied.
 
 
 7
 The orders of the District Court are affirmed. The mandates are directed to issue forthwith.
 
 
 8
 Mr. Justice MURPHY took no part in the consideration or decision of these cases.
 
 
 9
 [Argument of Counsel from pages 12-18 intentionally omitted]
 
 
 10
 Mr. Chief Justice STONE delivered the opinion of the Court.
 
 
 11
 These cases are brought here by petitioners' several applications for leave to file petitions for habeas corpus in this Court, and by their petitions for certiorari to review orders of the District Court for the District of Columbia, which denied their applications for leave to file petitions for habeas corpus in that court.
 
 
 12
 The question for decision is whether the detention of petitioners by respondent for trial by Military Commission, appointed by Order of the President of July 2, 1942, on charges preferred against them purporting to set out their violations of the law of war and of the Articles of War, is in conformity to the laws and Constitution of the United States.
 
 
 13
 After denial of their applications by the District Court, 47 F.Supp. 431, petitioners asked leave to file petitions for habeas corpus in this Court. In view of the public importance of the questions raised by their petitions and of the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty, and because in our opinion the public interest required that we consider and decide those questions without any avoidable delay, we directed that petitioners' applications be set down for full oral argument at a special term of this Court, convened on July 29, 1942. The applications for leave to file the petitions were presented in open court on that day and were heard on the petitions, the answers to them of respondent, a stipulation of facts by counsel, and the record of the testimony given before the Commission.
 
 
 14
 While the argument was proceeding before us, petitioners perfected their appeals from the orders of the District Court to the United States Court of Appeals for the District of Columbia and thereupon filed with this Court petitions for certiorari to the Court of Appeals before judgment, pursuant to Section 240(a) of the Judicial Code, 28 U.S.C. § 347(a), 28 U.S.C.A. § 347(a). We granted certiorari before judgment for the reasons which moved us to convene the special term of Court. In accordance with the stipulation of counsel we treat the record, briefs and arguments in the habeas corpus proceedings in this Court as the record, briefs and arguments upon the writs of certiorari.
 
 
 15
 On July 31, 1942, after hearing argument of counsel and after full consideration of all questions raised, this Court affirmed the orders of the District Court and denied petitioners' applications for leave to file petitions for habeas corpus. By per curiam opinion, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. —-, we announced the decision of the Court, and that the full opinion in the causes would be prepared and filed with the Clerk.
 
 
 16
 The following facts appear from the petitions or are stipulated. Except as noted they are undisputed.
 
 
 17
 All the petitioners were born in Germany; all have lived in the United States. All returned to Germany between 1933 and 1941. All except petitioner Haupt are admittedly citizens of the German Reich, with which the United States is at war. Haupt came to this country with his parents when he was five years old; it is contended that he became a citizen of the United States by virtue of the naturalization of his parents during his minority and that he has not since lost his citizenship. The Government, however, takes the position that on attaining his majority he elected to maintain German allegiance and citizenship or in any case that he has by his conduct renounced or abandoned his United States citizenship. See Perkins v. Elg, 307 U.S. 325, 334, 59 S.Ct. 884, 889, 83 L.Ed. 1320; United States ex rel. Rojak v. Marshall, D.C., 34 F.2d 219; United States ex rel. Scimeca v. Husband, 2 Cir., 6 F.2d 957, 958; 8 U.S.C. § 801, 8 U.S.C.A. § 801, and compare 8 U.S.C. § 808, 8 U.S.C.A. § 808. For reasons presently to be stated we do not find it necessary to resolve these contentions.
 
 
 18
 After the declaration of war between the United States and the German Reich, petitioners received training at a sabotage school near Berlin, Germany, where they were instructed in the use of explosives and in methods of secret writing. Thereafter petitioners, with a German citizen, Dasch, proceeded from Germany to a seaport in Occupied France, where petitioners Burger, Heinck and Quirin, together with Dasch, boarded a German submarine which proceeded across the Atlantic to Amagansett Beach on Long Island, New York. The four were there landed from the submarine in the hours of darkness, on or about June 13, 1942, carrying with them a supply of explosives, fuses and incendiary and timing devices. While landing they wore German Marine Infantry uniforms or parts of uniforms. Immediately after landing they buried their uniforms and the other articles mentioned and proceeded in civilian dress to New York City.
 
 
 19
 The remaining four petitioners at the same French port boarded another German submarine, which carried them across the Atlantic to Ponte Vedra Beach, Florida. On or about June 17, 1942, they came ashore during the hours of darkness wearing caps of the German Marine Infantry and carrying with them a supply of explosives, fuses, and incendiary and timing devices. They immediately buried their caps and the other articles mentioned and proceeded in civilian dress to Jacksonville, Florida, and thence to various points in the United States. All were taken into custody in New York or Chicago by agents of the Federal Bureau of Investigation. All had received instructions in Germany from an officer of the German High Command to destroy war industries and war facilities in the United States, for which they or their relatives in Germany were to receive salary payments from the German Government. They also had been paid by the German Government during their course of training at the sabotage school and had received substantial sums in United States currency, which were in their possession when arrested. The currency had been handed to them by an officer of the German High Command, who had instructed them to wear their German uniforms while landing in the United States.[1]
 
 
 20
 The President, as President and Commander in Chief of the Army and Navy, by Order of July 2, 1942,[2] appointed a Military Commission and directed it to try petitioners for offenses against the law of war and the Articles of War, and prescribed regulations for the procedure on the trial and for review of the record of the trial and of any judgment or sentence of the Commission. On the same day, by Proclamation,[3] the President declared that 'all persons who are subjects, citizens or residents of any nation at war with the United States or who give obedience to or act under the direction of any such nation, and who during time of war enter or attempt to enter the United States * * * through coastal or boundary defenses, and are charged with committing or attempting or preparing to commit sabotage, espionage, hostile or warlike acts, or violations of the law of war, shall be subject to the law of war and to the jurisdiction of military tribunals'.
 
 
 21
 The Proclamation also stated in terms that all such persons were denied access to the courts.
 
 
 22
 Pursuant to direction of the Attorney General, the Federal Bureau of Investigation surrendered custody of petitioners to respondent, Provost Marshal of the Military District of Washington, who was directed by the Secretary of War to receive and keep them in custody, and who thereafter held petitioners for trial before the Commission.
 
 
 23
 On July 3, 1942, the Judge Advocate General's Department of the Army prepared and lodged with the Commission the following charges against petitioners, supported by specifications:
 
 
 24
 1. Violation of the law of war.
 
 
 25
 2. Violation of Article 81 of the Articles of War, defining the offense of relieving or attempting to relieve, or corresponding with or giving intelligence to, the enemy.
 
 
 26
 3. Violation of Article 82, defining the offense of spying.
 
 
 27
 4. Conspiracy to commit the offenses alleged in charges 1, 2 and 3.
 
 
 28
 The Commission met on July 8, 1942, and proceeded with the trial, which continued in progress while the causes were pending in this Court. On July 27th, before petitioners' applications to the District Court, all the evidence for the prosecution and the defense had been taken by the Commission and the case had been closed except for arguments of counsel. It is conceded that ever since petitioners' arrest the state and federal courts in Florida, New York, and the District of Columbia, and in the states in which each of the petitioners was arrested or detained, have been open and functioning normally.
 
 
 29
 While it is the usual procedure on an application for a writ of habeas corpus in the federal courts for the court to issue the writ and on the return to hear and dispose of the case, it may without issuing the writ consider and determine whether the facts alleged by the petition, if proved, would warrant discharge of the prisoner. Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 578, 85 L.Ed. 830. Presentation of the petition for judicial action is the institution of a suit. Hence denial by the district court of leave to file the petitions in these causes was the judicial determination of a case or controversy, reviewable on appeal to the Court of Appeals and reviewable here by certiorari. See Ex parte Milligan, 4 Wall. 2, 110, 113, 18 L.Ed. 281; Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 1253, 86 L.Ed. 1595.
 
 
 30
 Petitioners' main contention is that the President is without any statutory or constitutional authority to order the petitioners to be tried by military tribunal for offenses with which they are charged; that in consequence they are entitled to be tried in the civil courts with the safeguards, including trial by jury, which the Fifth and Sixth Amendments guarantee to all persons charged in such courts with criminal offenses. In any case it is urged that the President's Order, in prescribing the procedure of the Commission and the method for review of its findings and sentence, and the proceedings of the Commission under the Order, conflict with Articles of War adopted by Congress—particularly Articles 38, 43, 46, 50 1/2 and 70—and are illegal and void.
 
 
 31
 The Government challenges each of these propositions. But regardless of their merits, it also insists that petitioners must be denied access to the courts, both because they are enemy aliens or have entered our territory as enemy belligerents, and because the President's Proclamation undertakes in terms to deny such access to the class of persons defined by the Proclamation, which aptly describes the character and conduct of petitioners. It is urged that if they are enemy aliens or if the Proclamation has force no court may afford the petitioners a hearing. But there is certainly nothing in the Proclamation to preclude access to the courts for determining its applicability to the particular case. And neither the Proclamation nor the fact that they are enemy aliens forecloses consideration by the courts of petitioners' contentions that the Constitution and laws of the United States constitutionally enacted forbid their trial by military commission. As announced in our per curiam opinion we have resolved those questions by our conclusion that the Commission has jurisdiction to try the charge preferred against petitioners. There is therefore no occasion to decide contentions of the parties unrelated to this issue. We pass at once to the consideration of the basis of the Commission's authority.
 
 
 32
 We are not here concerned with any question of the guilt or innocence of petitioners.[4] Constitutional safeguards for the protection of all who are charged with offenses are not to be disregarded in order to inflict merited punishment on some who are guilty. Ex parte Milligan, supra, 4 Wall. 119, 132, 18 L.Ed. 281; Tumey v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749, 50 A.L.R. 1243; Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 1161, 1162, 86 L.Ed. 1559. But the detention and trial of petitioners ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger—are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted.
 
 
 33
 Congress and the President, like the courts, possess no power not derived from the Constitution. But one of the objects of the Constitution, as declared by its preamble, is to 'provide for the common defence'. As a means to that end the Constitution gives to Congress the power to 'provide for the common Defence', Art. I, § 8, cl. 1; 'To raise and support Armies', 'To provide and maintain a Navy', Art. I, § 8, cls. 12, 13; and 'To make Rules for the Government and Regulation of the land and naval Forces', Art. I, § 8, cl. 14. Congress is given authority 'To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water', Art. I, § 8, cl. 11; and 'To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations', Art. I, § 8, cl. 10. And finally the Constitution authorizes Congress 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.' Art. I, § 8, cl. 18.
 
 
 34
 The Constitution confers on the President the 'executive Power', Art II, § 1, cl. 1, and imposes on him the duty to 'take Care that the Laws be faithfully executed'. Art. II, § 3. It makes him the Commander in Chief of the Army and Navy, Art. II, § 2, cl. 1, and empowers him to appoint and commission officers of the United States. Art. II, § 3, cl. 1.
 
 
 35
 The Constitution thus invests the President as Commander in Chief with the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing offences against the law of nations, including those which pertain to the conduct of war.
 
 
 36
 By the Articles of War, 10 U.S.C. §§ 1471—1593, 10 U.S.C.A. §§ 1471—1593, Congress has provided rules for the government of the Army. It has provided for the trial and punishment, by courts martial, of violations of the Articles by members of the armed forces and by specified classes of persons associated or serving with the Army. Arts. 1, 2. But the Articles also recognize the 'military commission' appointed by military command as an appropriate tribunal for the trial and punishment of offenses against the law of war not ordinarily tried by court martial. See Arts. 12, 15. Articles 38 and 46 authorize the President, with certain limitations, to prescribe the procedure for military commissions. Articles 81 and 82 authorize trial, either by court martial or military commission, of those charged with relieving, harboring or corresponding with the enemy and those charged with spying. And Article 15 declares that 'the provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions * * * or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war may be triable by such military commissions * * * or other military tribunals'. Article 2 includes among those persons subject to military law the personnel of our own military establishment. But this, as Article 12 provides, does not exclude from that class 'any other person who by the law of war is subject to trial by military tribunals' and who under Article 12 may be tried by court martial or under Article 15 by military commission.
 
 
 37
 Similarly the Espionage Act of 1917, which authorizes trial in the district courts of certain offenses that tend to interfere with the prosecution of war, provides that nothing contained in the act 'shall be deemed to limit the jurisdiction of the general courts-martial, military commissions, or naval courts-martial'. 50 U.S.C. § 38, 50 U.S.C.A. § 38.
 
 
 38
 From the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals.[5] By the Articles of War, and especially Article 15, Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases. Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals. And the President, as Commander in Chief, by his Proclamation in time of war his invoked that law. By his Order creating the present Commission he has undertaken to exercise the authority conferred upon him by Congress, and also such authority as the Constitution itself gives the Commander in Chief, to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war.
 
 
 39
 An important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war. It is unnecessary for present purposes to determine to what extent the President as Commander in Chief has constitutional power to create military commissions without the support of Congressional legislation. For here Congress has authorized trial of offenses against the law of war before such commissions. We are concerned only with the question whether it is within the constitutional power of the national government to place petitioners upon trial before a military commission for the offenses with which they are charged. We must therefore first inquire whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial. We may assume that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury. It was upon such grounds that the Court denied the right to proceed by military tribunal in Ex parte Milligan, supra. But as we shall show, these petitioners were charged with an offense against the law of war which the Constitution does not require to be tried by jury.
 
 
 40
 It is no objection that Congress in providing for the trial of such offenses has not itself undertaken to codify that branch of international law or to mark its precise boundaries, or to enumerate or define by statute all the acts which that law condemns. An Act of Congress punishing 'the crime of piracy as defined by the law of nations' is an appropriate exercise of its constitutional authority, Art. I, § 8, cl. 10, 'to define and punish' the offense since it has adopted by reference the sufficiently precise definition of international law. United States v. Smith, 5 Wheat. 153, 5 L.Ed. 57; see The Marianna Flora, 11 Wheat. 1, 40, 41, 6 L.Ed. 405; United States v. The Malek Adhel, 2 How. 210, 232, 11 L.Ed. 239; The Ambrose Light, D.C., 25 F. 408; 423, 428; 18 U.S.C. § 481, 18 U.S.C.A. § 481.[6] Similarly by the reference in the 15th Article of War to 'offenders or offenses that * * * by the law of war may be triable by such military commissions', Congress has incorporated by reference, as within the jurisdiction of military commissions, all offenses which are defined as such by the law of war (compare Dynes v. Hoover, 20 How. 65, 82, 15 L.Ed. 838), and which may constitutionally be included within that jurisdiction. Congress had the choice of crystallizing in permanent form and in minute detail every offense against the law of war, or of adopting the system of common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts. It chose the latter course.
 
 
 41
 By universal agreement and practice the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations[7] and also between those who are lawful and unlawful combatants. Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.[8] The spy who secretly and without uniform passes the military lines of a belligerent in time of war, seeking to gather military information and communicate it to the enemy, or an enemy combatant who without uniform comes secretly through the lines for the purpose of waging war by destruction of life or property, are familiar examples of belligerents who are generally deemed not to be entitled to the status of prisoners of war, but to be offenders against the law of war subject to trial and punishment by military tribunals. See Winthrop, Military Law, 2d Ed., pp. 1196—1197, 1219—1221; Instructions for the Government of Armies of the United States in the Field, approved by the President, General Order No. 100, April 24, 1863, sections IV and V.
 
 
 42
 Such was the practice of our own military authorities before the adoption of the Constitution,[9] and during the Mexican and Civil Wars.[10]
 
 
 43
 Paragraph 83 of General Order No. 100 of April 24, 1863, directed that: 'Scouts or single soldiers, if disguised in the dress of the country, or in the uniform of the army hostile to their own, employed in obtaining information, if found within or lurking about the lines of the captor, are treated as spies, and suffer death.' And Paragraph 84, that 'Armed Prowlers, by whatever names they may be called, or persons of the enemy's territory, who steal within the lines of the hostile army for the purpose of robbing, killing, or of destroying bridges, roads, or canals, or of robbing or destroying the mail, or of cutting the telegraph wires, are not entitled to the privileges of the prisoner of war.'[11] These and related provisions have been continued in substance by the Rules of Land Warfare promulgated by the War Department for the guidance of the Army. Rules of 1914, Par. 369—77; Rules of 1940, Par. 345—57. Paragraph 357 of the 1940 Rules provides that 'All war crimes are subject to the death penalty although a lesser penalty may be imposed'. Paragraph 8 (1940) divides the enemy population into 'armed forces' and 'peaceful population', and Paragraph 9 names as distinguishing characteristics of lawful belligerents that they 'carry arms openly' and 'have a fixed distinctive emblem'. Paragraph 348 declares that 'persons who take up arms and commit hostilities' without having the means of identification prescribed for belligerents are punishable as 'war criminals'. Paragraph 351 provides that 'men and bodies of men, who, without being lawful belligerents' 'nevertheless commit hostile acts of any kind' are not entitled to the privileges of prisoners of war if captured and may be tried by military commission and punished by death or lesser punishment. And Paragraph 352 provides that 'armed prowlers * * * or persons of the enemy territory who steal within the lines of the hostile army for the purpose of robbing, killing, or of destroying bridges, roads or canals, of robbing or destroying the mail, or of cutting the telegraph wires, are not entitled to be treated as prisoners of war'. As is evident from reading these and related Paragraphs 345—347, the specified violations are intended to be only illustrative of the applicable principles of the common law of war, and not an exclusive enumeration of the punishable acts recognized as such by that law. The definition of lawful belligerents by Paragraph 9 is that adopted by Article 1, Annex to Hague Convention No. IV of October 18, 1907, to which the United States was a signatory and which was ratified by the Senate in 1909. 36 Stat. 2279, 2295. The preamble to the Convention declares: 'Until a more complete code of the laws of war has been issued, the High Contracting Parties deem it expedient to declare that, in cases not included in the Regulations adopted by them, the inhabitants and the belligerents remain under the protection and the rule of the principles of the law of nations, as they result from the usages established among civilized peoples, from the laws of humanity and the dictates of the public conscience.'
 
 
 44
 Our Government, by thus defining lawful belligerents entitled to be treated as prisoners of war, has recognized that there is a class of unlawful belligerents not entitled to that privilege, including those who though combatants do not wear 'fixed and distinctive emblems'. And by Article 15 of the Articles of War Congress has made provision for their trial and punishment by military commission, according to 'the law of war'.
 
 
 45
 By a long course of practical administrative construction by its military authorities, our Government has likewise recognized that those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, have the status of unlawful combatants punishable as such by military commission. This precept of the law of war has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law[12] that we think it must be regarded as a rule or principle of the law of war recognized by this Government by its enactment of the Fifteenth Article of War.
 
 
 46
 Specification 1 of the First charge is sufficient to charge all the petitioners with the offense of unlawful belligerency, trial of which is within the jurisdiction of the Commission, and the admitted facts affirmatively show that the charge is not merely colorable or without foundation.
 
 
 47
 Specification 1 states that petitioners 'being enemies of the United States and acting for * * * the German Reich, a belligerent enemy nation, secretly and covertly passed, in civilian dress, contrary to the law of war, through the military and naval lines and defenses of the United States * * * and went behind such lines, contrary to the law of war, in civilian dress * * * for the purpose of committing * * * hostile acts, and, in particular, to destroy certain war industries, war utilities and war materials within the United States'.
 
 
 48
 This specification so plainly alleges violation of the law of war as to require but brief discussion of petitioners' contentions. As we have seen, entry upon our territory in time of war by enemy belligerents, including those acting under the direction of the armed forces of the enemy, for the purpose of destroying property used or useful in prosecuting the war, is a hostile and war-like act. It subjects those who participate in it without uniform to the punishment prescribed by the law of war for unlawful belligerents. It is without significance that petitioners were not alleged to have borne conventional weapons or that their proposed hostile acts did not necessarily contemplate collision with the Armed Forces of the United States. Paragraphs 351 and 352 of the Rules of Land Warfare, already referred to, plainly contemplate that the hostile acts and purposes for which unlawful belligerents may be punished are not limited to assaults on the Armed Forces of the United States. Modern warfare is directed at the destruction of enemy war supplies and the implements of their production and transportation quite as much as at the armed forces. Every consideration which makes the unlawful belligerent punishable is equally applicable whether his objective is the one or the other. The law of war cannot rightly treat those agents of enemy armies who enter our territory, armed with explosives intended for the destruction of war industries and supplies, as any the less belligerent enemies than are agent similarly entering for the purpose of destroying fortified places or our Armed Forces. By passing our boundaries for such purposes without uniform or other emblem signifying their belligerent status, or by discarding that means of identification after entry, such enemies become unlawful belligerents subject to trial and punishment.
 
 
 49
 Citizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war. Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of the Hague Convention and the law of war. Cf. Gates v. Goodloe, 101 U.S. 612, 615, 617, 618, 25 L.Ed. 895. It is as an enemy belligerent that petitioner Haupt is charged with entering the United States, and unlawful belligerency is the gravamen of the offense of which he is accused.
 
 
 50
 Nor are petitioners any the less belligerents if, as they argue, they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations. The argument leaves out of account the nature of the offense which the Government charges and which the Act of Congress, by incorporating the law of war, punishes. It is that each petitioner, in circumstances which gave him the status of an enemy belligerent, passed our military and naval lines and defenses or went behind those lines, in civilian dress and with hostile purpose. The offense was complete when with that purpose they entered—or, having so entered, they remained upon—our territory in time of war without uniform or other appropriate means of identification. For that reason, even when committed by a citizen, the offense is distinct from the crime of treason defined in Article III, § 3 of the Constitution, since the absence of uniform essential to one is irrelevant to the other. Cf. Morgan v. Devine, 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153; Albrecht v. United States, 273 U.S. 1, 11, 12, 47 S.Ct. 250, 253, 254, 71 L.Ed. 505.
 
 
 51
 But petitioners insist that even if the offenses with which they are charged are offenses against the law of war, their trial is subject to the requirement of the Fifth Amendment that no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, and that such trials by Article III, § 2, and the Sixth Amendment must be by jury in a civil court. Before the Amendments, § 2 of Article III, the Judiciary Article, had provided: 'The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury', and had directed that 'such Trial shall be held in the State where the said Crimes shall have been committed'.
 
 
 52
 Presentment by a grand jury and trial by a jury of the vicinage where the crime was committed were at the time of the adoption of the Constitution familiar parts of the machinery for criminal trials in the civil courts. But they were procedures unknown to military tribunals, which are not courts in the sense of the Judiciary Article, Ex parte Vallandigham, 1 Wall. 243, 17 L.Ed. 589; In re Vidal, 179 U.S. 126, 21 S.Ct. 48, 45 L.Ed. 118; cf. Williams v. United States, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372, and which in the natural course of events are usually called upon to function under conditions precluding resort to such procedures. As this Court has often recognized, it was not the purpose or effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial. The object was to preserve unimpaired trial by jury in all those cases in which it had been recognized by the common law and in all cases of a like nature as they might arise in the future, District of Columbia v. Colts, 282 U.S. 63, 51 S.Ct. 52, 75 L.Ed. 177, but not to bring within the sweep of the guaranty those cases in which it was then well understood that a jury trial could not be demanded as of right.
 
 
 53
 The Fifth and Sixth Amendments, while guaranteeing the continuance of certain incidents of trial by jury which Article III, § 2 had left unmentioned, did not enlarge the right to jury trial as it had been established by that Article. Callan v. Wilson, 127 U.S. 540, 549, 8 S.Ct. 1301, 1303, 32 L.Ed. 223. Hence petty offenses triable at common law without a jury may be tried without a jury in the federal courts, notwithstanding Article III, § 2, and the Fifth and Sixth Amendments. Schick v. United States, 195 U.S. 65, 24 S.Ct. 826, 49 L.Ed. 99, 1 Ann.Cas. 585; District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843. Trial by jury of criminal contempts may constitutionally be dispensed with in the federal courts in those cases in which they could be tried without a jury at common law. Ex parte Terry, 128 U.S. 289, 302, 304, 9 S.Ct. 77, 79, 32 L.Ed. 405; Savin, Petitioner, 131 U.S. 267, 277, 9 S.Ct. 699, 701, 33 L.Ed. 150; In re Debs, 158 U.S. 564, 594—596, 15 S.Ct. 900, 910, 911, 39 L.Ed. 1092; United States v. Shipp, 203 U.S. 563, 572, 27 S.Ct. 165, 166, 51 L.Ed. 319, 8 Ann.Cas. 265; Blackmer v. United States, 284 U.S. 421, 440, 52 S.Ct. 252, 255, 76 L.Ed. 375; Nye v. United States, 313 U.S. 33, 48, 61 S.Ct. 810, 815, 85 L.Ed. 1172; see United States v. Hudson and Goodwin, 7 Cranch 32, 34, 3 L.Ed. 259. Similarly, an action for debt to enforce a penalty inflicted by Congress is not subject to the constitutional restrictions upon criminal prosecutions. United States v. Zucker, 161 U.S. 475, 16 S.Ct. 641, 40 L.Ed. 777; United States v. Regan, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494, and cases cited.
 
 
 54
 All these are instances of offenses committed against the United States, for which a penalty is imposed, but they are not deemed to be within Article III, § 2 or the provisions of the Fifth and Sixth Amendments relating to 'crimes' and 'criminal prosecutions'. In the light of this long-continued and consistent interpretation we must concluded that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts.
 
 
 55
 The fact that 'cases arising in the land or naval forces' are excepted from the operation of the Amendments does not militate against this conclusion. Such cases are expressly excepted from the Fifth Amendment, and are deemed excepted by implication from the Sixth. Ex parte Milligan, supra, 4 Wall. 123, 138, 139, 18 L.Ed. 281. It is argued that the exception, which excludes from the Amendment cases arising in the armed forces, has also by implication extended its guaranty to all other cases; that since petitioners, not being members of the Armed Forces of the United States, are not within the exception, the Amendment operates to give to them the right to a jury trial. But we think this argument misconceives both the scope of the Amendment and the purpose of the exception.
 
 
 56
 We may assume, without deciding, that a trial prosecuted before a military commission created by military authority is not one 'arising in the land * * * forces', when the accused is not a member of or associated with those forces. But even so, the exception cannot be taken to affect those trials before military commissions which are neither within the exception nor within the provisions of Article III, § 2, whose guaranty the Amendments did not enlarge. No exception is necessary to exclude from the operation of these provisions cases never deemed to be within their terms. An express exception from Article III, § 2, and from the Fifth and Sixth Amendments, of trials of petty offenses and of criminal contempts has not been found necessary in order to preserve the traditional practice of trying those offenses without a jury. It is no more so in order to continue the practice of trying, before military tribunals without a jury, offenses committed by enemy belligerents against the law of war.
 
 
 57
 Section 2 of the Act of Congress of April 10, 1806, 2 Stat. 371, derived from the Resolution of the Continental Congress of August 21, 1776,[13] imposed the death penalty on alien spies 'according to the law and usage of nations, by sentence of a general court martial'. This enactment must be regarded as a contemporary construction of both Article III, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces. It is a construction of the Constitution which has been followed since the founding of our government, and is now continued in the 82nd Article of War. Such a construction is entitled to the greatest respect. Stuart v. Laird, 1 Cranch, 299, 309, 2 L.Ed. 115; Field v. Clark, 143 U.S. 649, 691, 12 S.Ct. 495, 504, 36 L.Ed. 294; United States v. Curtiss-Wright Corp., 299 U.S. 304, 328, 57 S.Ct. 216, 224, 81 L.Ed. 225. It has not hitherto been challenged, and so far as we are advised it has never been suggested in the very extensive literature of the subject that an alien spy, in time of war, could not be tried by military tribunal without a jury.[14]
 
 
 58
 The exception from the Amendments of 'cases arising in the land or naval forces' was not aimed at trials by military tribunals, without a jury, of such offenses against the law of war. Its objective was quite different—to authorize the trial by court martial of the members of our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts. The cases mentioned in the exception are not restricted to those involving offenses against the law of war alone, but extend to trial of all offenses, including crimes which were of the class traditionally triable by jury at common law. Ex parte Mason, 105 U.S. 696, 26 L.Ed. 1213; Kahn v. Anderson, 255 U.S. 1, 8, 9, 41 S.Ct. 224, 225, 226, 65 L.Ed. 469; cf. Caldwell v. Parker, 252 U.S. 376, 40 S.Ct. 388, 64 L.Ed. 621.
 
 
 59
 Since the Amendments, like § 2 of Article III, do not preclude all trials of offenses against the law of war by military commission without a jury when the offenders are aliens not members of our Armed Forces, it is plain that they present no greater obstacle to the trial in like manner of citizen enemies who have violated the law of war applicable to enemies. Under the original statute authorizing trial of alien spies by military tribunals, the offenders were outside the constitutional guaranty of trial by jury, not because they were aliens but only because they had violated the law of war by committing offenses constitutionally triable by military tribunal.
 
 
 60
 We cannot say that Congress in preparing the Fifth and Sixth Amendments intended to extend trial by jury to the cases of alien or citizen offenders against the law of war otherwise triable by military commission, while withholding it from members of our own armed forces charged with infractions of the Articles of War punishable by death. It is equally inadmissible to construe the Amendments— whose primary purpose was to continue unimpaired presentment by grand jury and trial by petit jury in all those cases in which they had been customary—as either abolishing all trials by military tribunals, save those of the personnel of our own armed forces, or what in effect comes to the same thing, as imposing on all such tribunals the necessity of proceeding against unlawful enemy belligerents only on presentment and trial by jury. We conclude that the Fifth and Sixth Amendments did not restrict whatever authority was conferred by the Constitution to try offenses against the law of war by military commission, and that petitioners, charged with such an offense not required to be tried by jury at common law, were lawfully placed on trial by the Commission without a jury.
 
 
 61
 Petitioners, and especially petitioner Haupt, stress the pronouncement of this Court in the Milligan case, 4 Wall. page 121, 18 L.Ed. 281, that the law of war 'can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed'. Elsewhere in its opinion, 4 Wall. at pages 118, 121, 122, and 131, 18 L.Ed. 281, the Court was at pains to point out that Milligan, a citizen twenty years resident in Indiana, who had never been a resident of any of the states in rebellion, was not an enemy belligerent either entitled to the status of a prisoner of war or subject to the penalties imposed upon unlawful belligerents. We construe the Court's statement as to the inapplicability of the law of war to Milligan's case as having particular reference to the facts before it. From them the Court concluded that Milligan, not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the law of war save as—in circumstances found not there to be present and not involved here—martial law might be constitutionally established.
 
 
 62
 The Court's opinion is inapplicable to the case presented by the present record. We have no occasion now to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war. It is enough that petitioners here, upon the conceded facts, were plainly within those boundaries, and were held in good faith for trial by military commission, charged with being enemies who, with the purpose of destroying war materials and utilities, entered or after entry remained in our territory without uniform—an offense against the law of war. We hold only that those particular acts constitute an offense against the law of war which the Constitution authorizes to be tried by military commission.
 
 
 63
 Since the first specification of Charge I set forth a violation of the law of war, we have no occasion to pass on the adequacy of the second specification of Charge I, or to construe the 81st and 82nd Articles of War for the purpose of ascertaining whether the specifications under Charges II and III allege violations of those Articles or whether if so construed they are constitutional. McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238.
 
 
 64
 There remains the contention that the President's Order of July 2, 1942, so far as it lays down the procedure to be followed on the trial before the Commission and on the review of its findings and sentence, and the procedure in fact followed by the Commission, are in conflict with Articles of War 38, 43, 46, 50 1/2 and 70. Petitioners argue that their trial by the Commission, for offenses against the law of war and the 81st and 82nd Articles of War, by a procedure which Congress has prohibited would invalidate any conviction which could be obtained against them and renders their detention for trial likewise unlawful (see McClaughry v. Deming, 186 U.S. 49, 22 S.Ct. 786, 46 L.Ed. 1049; United States v. Brown, 206 U.S. 240, 244, 27 S.Ct. 620, 621, 51 L.Ed. 1046; Runkle v. United States, 122 U.S. 543, 555, 556, 7 S.Ct. 1141, 1146, 30 L.Ed. 1167; Dynes v. Hoover, 20 How. 65, 80, 81, 15 L.Ed. 838); that the President's Order prescribes such an unlawful procedure; and that the secrecy surrounding the trial and all proceedings before the Commission, as well as any review of the decision, will preclude a later opportunity to test the lawfulness of the detention.
 
 
 65
 Petitioners do not argue and we do not consider the question whether the President is compelled by the Articles of War to afford unlawful enemy belligerents a trial before subjecting them to disciplinary measures. Their contention is that, if Congress has authorized their trial by military commission upon the charges preferred—violations of the law of war and the 81st and 82nd Articles of War—it has by the Articles of War prescribed the procedure by which the trial is to be conducted; and that since the President has ordered their trial for such offenses by military commission, they are entitled to claim the protection of the procedure which Congress has commanded shall be controlling.
 
 
 66
 We need not inquire whether Congress may restrict the power of the Commander in Chief to deal with enemy belligerents. For the Court is unanimous in its conclusion that the Articles in question could not at any stage of the proceedings afford any basis for issuing the writ. But a majority of the full Court are not agreed on the appropriate grounds for decision. Some members of the Court are of opinion that Congress did not intend the Articles of War to govern a Presidential military commission convened for the determination of questions relating to admitted enemy invaders and that the context of the Articles makes clear that they should not be construed to apply in that class of cases. Others are of the view that—even though this trial is subject to whatever provisions of the Articles of War Congress has in terms made applicable to 'commissions'—the particular Articles in question, rightly construed, do not foreclose the procedure prescribed by the President or that shown to have been employed by the Commission in a trial of offenses against the law of war and the 81st and 82nd Articles of War, by a military commission appointed by the President.
 
 
 67
 Accordingly, we conclude that Charge I, on which petitioners were detained for trial by the Military Commission, alleged an offense which the President is authorized to order tried by military commission; that his Order convening the Commission was a lawful order and that the Commission was lawfully constituted; that the petitioners were held in lawful custody and did not show cause for their discharge. It follows that the orders of the District Court should be affirmed, and that leave to file petitions for habeas corpus in this Court should be denied.
 
 
 68
 Mr. Justice MURPHY took no part in the consideration or decision of these cases.
 
 
 69
 Orders of District Court affirmed and leave to file petitions for habeas corpus in the Supreme Court denied.
 
 
 
 [1]
 From June 12 to June 18, 1942, Amagansett Beach, New York, and Ponte Vedra Beach, Florida, were within the area designated as the Eastern Defense Command of the United States Army, and subject to the provisions of a proclamation dated May 16, 1942, issued by Lieutenant General Hugh A. Drum, United States Army, Commanding General, Eastern Defense Command (see 7 Federal Register 3830). On the night of June 12-13, 1942, the waters around Amagansett Beach, Long Island, were within the area comprising the Eastern Sea Frontier, pursuant to the orders issued by Admiral Ernest J. King, Commander in Chief of the United States Fleet and Chief of Naval Operations. On the night of June 16-17, 1942, the waters around Ponte Vedra Beach, Florida, were within the area comprising the Gulf Sea Frontier, pursuant to similar orders.
 On the night of June 12-13, 1942, members of the United States Coast Guard, unarmed, maintained a beach patrol along the beaches surrounding Amagansett, Long Island, under written orders mentioning the purpose of detecting landings. On the night of June 17-18, 1942, the United States Army maintained a patrol of the beaches surrounding and including Ponte Vedra Beach, Florida, under written orders mentioning the purpose of detecting the landing of enemy agents from submarines.
 
 
 [2]
 Federal Register 5103.
 
 
 [3]
 No. 2561, 7 Federal Register 5101.
 
 
 [4]
 As appears from the stipulation, a defense offered before the Military Commission was that petitioners had had no intention to obey the orders given them by the officer of the German High Command.
 
 
 [5]
 Talbot v. Jansen, 3 Dall. 133, 153, 159, 161, 1 L.Ed. 540; Talbot v. Seeman, 1 Cranch 1, 40, 41, 2 L.Ed. 15; Maley v. Shattuck, 3 Cranch 458, 488, 2 L.Ed. 498; Fitzsimmons v. Newport Ins. Co., 4 Cranch 185, 199, 2 L.Ed. 591; The Rapid, 8 Cranch 155, 159-164, 3 L.Ed. 520; The St. Lawrence, 9 Cranch 120, 122, 3 L.Ed. 676; Thirty Hogsheads of Sugar v. Boyle, 9 Cranch 191, 197, 198, 3 L.Ed. 701; The Anne, 3 Wheat. 435, 447, 448, 4 L.Ed. 428; United States v. Reading, 18 How. 1, 10, 15 L.Ed. 291; Prize Cases (The Amy Warwick), 2 Black 635, 666, 667, 687, 17 L.Ed. 459; The Venice, 2 Wall. 258, 274, 17 L.Ed. 866; The William Bagaley, 5 Wall. 377, 18 L.Ed. 583; Miller v. United States, 11 Wall. 268, 20 L.Ed. 135; Coleman v. Tennessee, 97 U.S. 509, 517, 24 L.Ed. 1118; United States v. Pacific R.R., 120 U.S. 227, 233, 7 S.Ct. 490, 492, 30 L.Ed. 634; Juragua Iron Co. v. United States, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520.
 
 
 [6]
 Compare 28 U.S.C. § 41(17), 28 U.S.C.A. § 41(17), conferring on the federal courts jurisdiction over suits brought by an alien for a tort 'in violation of the laws of nations'; 28 U.S.C. § 341, 28 U.S.C.A. § 341, conferring upon the Supreme Court such jurisdiction of suits against ambassadors as a court of law can have 'consistently with the law of nations'; 28 U.S.C. § 462, 28 U.S.C.A. § 462, regulating the issuance of habeas corpus where the prisoner claims some right, privilege or exemption under the order of a foreign state, 'the validity and effect whereof depend upon the law of nations'; 15 U.S.C. §§ 606b and 713b, 15 U.S.C.A. §§ 606b, 713b, authorizing certain loans to foreign governments, provided that 'no such loans shall be made in violation of international law as interpreted by the Department of States.'
 
 
 [7]
 Hague Convention No. IV of October 18, 1907, 36 Stat. 2295, Article I of the Annex to which defines the persons to whom belligerent rights and duties attach, was signed by 44 nations. See, also, Great Britain, War Office, Manual of Military Law (1929) ch. xiv, §§ 17-19; German General Staff, Kriegsbrauch im Landkriege (1902) ch. 1; 7 Moore, Digest of International Law, § 1109; 2 Hyde, International Law (1922) § 653-54; 2 Oppenheim, International Law (6th Ed. 1940) § 107; Bluntschli, Droit International (5th Ed. tr. Lardy) §§ 531-32; 4 Calvo, Le Droit International Theorique et Pratique (5th Ed. 1896) §§ 2034-35.
 
 
 [8]
 Great Britain, War Office, Manual of Military Law, ch. xiv, §§ 445-451; Regolamento di Servizio in Guerra, § 133, 3 Leggi e Decreti del Regno d'Italia (1896) 3184; 7 Moore, Digest of International Law, § 1109; 2 Hyde, International Law, §§ 654, 652; 2 Halleck, International Law (4th Ed. 1908) § 4; 2 Oppenheim, International Law, § 254; Hall, International Law, §§ 127, 135; Baty & Morgan, War, Its Conduct and Legal Results (1915) 172; Bluntschli, Droit International, §§ 570 bis.
 
 
 [9]
 On September 29, 1780, Major John Andre, Adjutant-General to the British Army, was tried by a 'Board of General Officers' appointed by General Washington, on a charge that he had come within the lines for an interview with General Benedict Arnold and had been captured while in disguise and travelling under an assumed name. The Board found that the facts charged were true, and that when captured Major Andre had in his possession papers containing intelligence, for the enemy, and reported their conclusion that 'Major Andre * * * ought to be considered as a Spy from the enemy, and that agreeably to the law and usage of nations * * * he ought to suffer death.' Major Andre was hanged on October 2, 1780. Proceedings of a Board of General Officers Respecting Major John Andre, Sept. 29, 1780, printed at Philadelphia in 1780.
 
 
 [10]
 During the Mexican War military commissions were created in a large number of instances for the trial of various offenses. See General Orders cited in 2 Winthrop, Military Law (2d Ed. 1896) p. 1298, note 1.
 During the Civil War the military commission was extensively used for the trial of offenses against the law of war. Among the more significant cases for present purposes are the following:
 On May 22, 1865, T. E. Hogg and others were tried by a Military Commission, for 'violations of the laws and usages of civilized war', the specifications charging that the accused 'being commissioned, enrolled, enlisted or engaged' by the Confederate Government, came on board a United States merchant steamer in the port of Panama 'in the guise of peaceful passengers' with the purpose of capturing the vessel and converting her into a Confederate cruiser. The Commission found the accused guilty and sentenced them to be hanged. The reviewing authority affirmed the judgments, writing an extensive opinion on the question whether violations of the law of war were alleged, but modified the sentences to imprisonment for life and for various periods of years. Dept. of the Pacific, G.O. No. 52, June 27, 1865.
 On January 17, 1865, John Y. Beall was tried by a military commission for 'violation of the laws of war'. The opinion by the reviewing authority reveals that Beall, holding a commission in the Confederate Navy, came on board a merchant vessel at a Canadian port in civilian dress and, with associates, took possession of the vessel in Lake Erie; that, also in disguise, he unsuccessfully attempted to derail a train in New York State, and to obtain military information. His conviction by the Commission was affirmed on the ground that he was both a spy
 and a 'guerrilla', and he was sentenced to be hanged. Dept. of the East, G.O. No. 14, Feb. 14, 1865.
 On January 17, 1865, Robert C. Kennedy, a Captain of the Confederate Army, who was shown to have attempted, while in disguise, to set fire to the City of New York, and to have been seen in disguise in various parts of New York State, was convicted on charges of acting as a spy and violation of the law of war 'in undertaking to carry on irregular and unlawful warfare'. He was sentenced to be hanged, and the sentence was confirmed by the reviewing authority. Dept. of the East, G.O. No. 24, March 20, 1865.
 On September 19, 1865, William Murphy, 'a rebel emissary in the employ of and colleagued with rebel enemies' was convicted by a military commission of 'violation of the laws and customs of war' for coming within the lines and burning a United States steamboat and other property. G.C.M.O. No. 107, April 18, 1866.
 Soldiers and officers 'now or late of the Confederate Army', were tried and convicted by military commission for 'being secretly within the lines of the United States forces', James Hamilton, Dept. of the Ohio, G.O. No. 153, Sept. 18, 1863; for 'recruiting men within the lines', Daniel Davis, G.O. No. 397, Dec. 18, 1863, and William F. Corbin and T. G. McGraw, G.O. No. 114, May 4, 1863; and for 'lurking about the posts, quarters, fortifications and encampments of the armies of the United States', although not 'as a spy', Augustus A. Williams, Middle Dept., G.O. No. 34, May 5, 1864. For other cases of violations of the law of war punished by military commissions during the Civil War see 2 Winthrop, Military Laws and Precedents (2d ed. 1896) 1310-11.
 
 
 [11]
 See also Paragraph 100: 'A messenger or agent who attempts to steal through the territory occupied by the enemy to further in any manner the interests of the enemy, if captured, is not entitled to the privileges of the prisoner of war, and may be dealt with according to the circumstances of the case.'
 Compare Paragraph 101.
 
 
 [12]
 Great Britain, War Office, Manual of Military Law (1929) § 445, lists a large number of acts which, when committed within enemy lines by persons in civilian dress associated with or acting under the direction of enemy armed forces, are 'war crimes'. The list includes: 'damage to railways, war material, telegraph, or other means of communication, in the interest of the enemy. * * *' Section 449 states that all 'war crimes' are punishable by death.
 Authorities on International Law have regarded as war criminals such persons who pass through the lines for the purpose of (a) destroying bridges, war materials, communication facilities etc.; 2 Oppenheim, International Law (6th ed. 1940) § 255; Spaight, Air Power and War Rights (1924) 283; Spaight, War Rights on Land (1911) 110; Phillipson, International Law and the Great War (1915) 208; Liszt, Das Vo lkerrecht (12 ed. 1925), § 58(B)4; (b) carrying messages secretly: Hall, International Law (8th ed. 1924) § 188; Spaight, War Rights on Land 215; 3 Merignhac, Droit Public International (1912) 296-97; Bluntschli, Droit International Codifie (5th ed. tr. Lardy) § 639; 4 Calvo, Le Droit International Theorique et Pratique (5th ed. 1896) § 2119; (c) any hostile act: 2 Winthrop, Military Law and Precedents, (2nd ed. 1896) 1224. Cf. Lieber, Guerrilla Parties (1862) 2 Miscellaneous Writings (1881) 288.
 These authorities are unanimous in stating that a soldier in uniform who commits the acts mentioned would be entitled to treatment as a prisoner of war; it is the absence of uniform that renders the offender liable to trial for violation of the laws of war.
 
 
 [13]
 See Morgan, Court-Martial Jurisdiction over Non-Military Persons under the Articles of War, 4 Minnesota L.Rev. 79, 107-09.
 
 
 [14]
 In a number of cases during the Revolutionary War enemy spies were tried and convicted by military tribunals: (1) Major John Andre, Sept. 29, 1780, see note 9 supra. (2) Thomas Shanks was convicted by a 'Board of General Officers' at Valley Forge on June 3, 1778, for 'being a Spy in the Service of the Enemy' and sentenced to be hanged. 12 Writings of Washington (Bicentennial Comm'n ed.) 14. (3) Matthias Colbhart was convicted of 'holding a Correspondence with the Enemy' and 'living as a Spy among the Continental Troops' by a General Court Martial convened by order of Major General Putnam on Jan. 13, 1778; General Washington, the Commander in Chief, ordered the sentence of death to be executed, 12 Id. 449-50. (4) John Clawson, Ludwick Lasick, and William Hutchinson were convicted of 'lurking as spies in the Vicinity of the Army of the United States' by a General Court Martial held on June 18, 1780. The death sentence was confirmed by the Commander in Chief. 19 Id. 23. (5) David Farnsworth and John Blair were convicted of 'being found about the Encampment of the United States as Spies' by a Division General Court Martial held on Oct. 8, 1778 by order of Major General Gates. The death sentence was confirmed by the Commander in Chief. 13 Id. 139-40. (6) Joseph Bettys was convicted of being 'a Spy for General Burgoyne' by coming secretly within the American lines, by a General Court Martial held on April 6, 1778 by order of Major General McDougall. The death sentence was confirmed by the Commander in Chief. 15 Id. 364. (7) Stephen Smith was convicted of 'being a Spy' by a General Court Martial held on Jan. 6, 1778. The death sentence was confirmed by Major General McDougall. Ibid. (8) Nathaniel Aherly and Reuben Weeks, Loyalist soldiers, were sentenced to be hanged as spies. Proceedings of a General Court Martial Convened at West Point According to a General Order of Major General Arnold, Aug. 20-21, 1780 (National Archives, War Dept., Revolutionary War Records, MS No. 31521). (9) Jonathan Loveberry, a Loyalist soldier, was sentenced to be hanged as a spy, Proceedings of a General Court Martial Convened at the Request of Major General Arnold at the Township of Bedford, Aug. 30-31, 1780 (Id. MS No. 31523); he later escaped, 20 Writings of Washington 253n. (10) Daniel Taylor, a lieutenant in the British Army, was convicted as a spy by a general court martial convened on Oct. 14, 1777, by order of Brigadier General George Clinton, and was hanged. 2 Public Papers of George Clinton (1900) 443. (11) James Molesworth was convicted as a spy and sentenced to death by a general court martial, held at Philadelphia, March 29, 1777; Congress confirmed the order of Major General Gates for the execution of the sentence. 7 Journals of the Continental Congress 210. See also cases of 'M.A.' and 'D.C.', G.O. Headquarters of General Sullivan, Providence, R.I., July 24, 1778, reprinted in Niles, Principles and Acts of the Revolution (1822) 369; of Lieutenant Palmer, 9 Writings of Washington, 56n; of Daniel Strang, 6 Id. 497n; of Edward Hicks, 14 Id. 357; of John Mason and James Ogden, executed as spies near Trenton, N.J., on Jan. 10, 1781, mentioned in Hatch, Administration of the American Revolutionary Army (1904) 135 and Van Doren, Secret History of the American Revolution (1941) 410.
 During the War of 1812, William Baker was convicted as a spy and sentenced to be hanged by a general court martial presided over by Brigadier General Thomas A. Smith at Plattsburg, N.Y., on March 25, 1814. (National Archives, War Dept., Judge Advocate General's Office, Records of Courts Martial, MS No. O-13). William Utley, tried as a spy by a court martial held at Plattsburg, March 3-5, 1814, was acquitted (Id., MS No. X-161). Elijah Clark was convicted as a spy, and sentenced to be hanged, by a general court martial held at Buffalo, N.Y., Aug. 5-8, 1812; he was ordered released by President Madison on the ground that he was an American citizen. Military Monitor, Vol. I, No. 23, Feb. 1, 1813, pp. 121-122; Maltby, Treatise on Courts Martial and Military Law (1813) 35-36.
 In 1862 Congress amended the spy statute to include 'all persons' instead of only aliens. 12 Stat. 339, 340, 34 U.S.C.A. § 1200, art. 5; see also 12 Stat. 731, 737, 34 U.S.C.A. § 1200, art. 5. For the legislative history, see Morgan, Court-Martial Jurisdiction over Non-Military Persons under the Articles of War, 4 Minnesota L.Rev. 79, 109-11. During the Civil War a number of Confederate officers and soldiers found within the Union lines in disguise were tried and convicted by military commission for being spies. Charles H. Clifford, G.O. No. 135, May 18, 1863; William S. Waller, G.O. No. 269, Aug. 4, 1863; Alfred Yates and George W. Casey, G.O. No. 382, Nov. 28, 1863; James R. Holton and James Taylor, G.C.M.O. No. 93, May 13, 1864; James McGregory, G.C.M.O. No. 152, June 4, 1864; E.S. Dodd, Dept. of Ohio, G.O. No. 3, Jan. 5, 1864. For other cases of spies tried by military commission see 2 Winthrop, Military Law and Precedents, 1193 et seq.