Falen GHEREBI\*, Petitioner–
Appellant,

v.

George Walker BUSH; Donald H.
Rumsfeld, Respondents–
Appellees.

No. 03–55785.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 2003.

Opinion Filed Dec. 18, 2003.

Amended July 8, 2004.

---

\* Gherebi's correct first name appears to be
"Salim." The court records thus far all refer
to him as "Falen" however. To avoid confu-
sion on the part of readers of the various
decisions we will continue to refer to him as
"Falen."

Stephen Yagman, Esq., Venice, CA, for Petitioner–Appellant.

Paul Clement, Department of Justice, Washington, DC, for Respondents–Appellees.

Before: REINHARDT, GRABER, Circuit Judges, and SHADUR, Senior Judge.**

Opinion by Judge REINHARDT; Partial Concurrence by Judge GRABER

REINHARDT, Circuit Judge:

## I. BACKGROUND

This case presents the question whether the Executive Branch may hold uncharged citizens of foreign nations in indefinite detention in territory under the "complete jurisdiction and control" of the United States while effectively denying them the right to challenge their detention in any tribunal anywhere, including the courts of the U.S. The issues we are required to confront are new, important, and difficult.

In the wake of the devastating terrorist attacks on September 11, 2001, Congress authorized the President to

use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub.L. No. 107–40, 115 Stat. 224 (2001). Pursuant to that authorization, the President sent U.S. forces to Afghanistan to wage a military operation that has been commonly termed—but never formally declared—a "war" against the Taliban government and the terrorist network known as Al Queda.

Starting in early January 2002, the Armed Forces began transferring to Guantanamo, a United States naval base located on territory physically situated on the island of Cuba,[1] scores of individuals who were captured by the American military during its operations in Afghanistan. The captured individuals were labeled "enemy combatants." Now, for almost two years, the United States has subjected over six hundred of these captives to indefinite detention,[2] yet has failed to afford them any means to challenge their confinement, to object to the failure to recognize them as

---

** The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. For convenience, we sometimes refer to Guantanamo Naval Base as "Guantanamo" and sometimes simply as "the Base."

2. Although there is a dearth of official reports as to the conditions at Guantanamo, there have been a number of newspaper stories reporting on the subject, including interviews with Afghani and Pakistani citizens released without the filing of charges. Some of the prisoners released have said that the uncertainty of their fate, combined with linguistic isolation from others with whom they could

communicate, confinement in very small cells, little protection from the elements, and being allowed only one one-minute shower per week led a number of detainees to attempt suicide multiple times. *See* Carlotta Gall & Neil A. Lewis, *Threats and Responses: Captives; Tales of Despair from Guantanamo*, N.Y. TIMES, June 17, 2003, at A1; *see also* Neil A. Lewis, *Red Cross Criticizes Indefinite Detention in Guantanamo*, N.Y. TIMES, Oct. 10, 2003, at A1 (reporting that in 18 months, 21 detainees have made 32 suicide attempts, a high incidence which human rights groups attribute to the uncertainty of their situation).

prisoners of war, to consult with legal counsel, or even to advance claims of mistaken capture or identity. Despite U.S. officials' recent stated intention to move to begin a sorting of the detainees, electing which to release and which to try before military tribunals on criminal charges, and the administration's designation several months ago of six detainees (including two Britons and one Australian) deemed eligible for military trials, *see* Neil A. Lewis, *Red Cross Criticizes Indefinite Detention in Guantanamo,* N.Y. TIMES, Oct. 10, 2003, at A1, no military tribunal has actually been convened. Nor has a single Guantanamo detainee been given the opportunity to consult an attorney, had formal charges filed against him, or been permitted to contest the basis of his detention in any way. Moreover, top U.S. officials, including Secretary of Defense Rumsfeld, have made it clear that the detainees may be held in their present circumstances until this country's campaign against terrorism ends. *Id.* The administration has, understandably, given no indication whether that event will take place in a matter of months, years, or decades, if ever.[3]

On January 20, 2002, a group of journalists, lawyers, professors, and members of the clergy filed a petition for habeas relief before the United States District Court for the Central District of California on behalf of the class of unidentified individuals detained involuntarily at Guantanamo. The petition named as respondents President Bush, Secretary Rumsfeld, and a number of military personnel. *See Coalition of Clergy v. Bush,* 189 F.Supp.2d 1036 (C.D.Cal.2002). After the district court dismissed the petition for lack of "next-friend" standing, or, alternatively, for lack of jurisdiction under *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), this court affirmed on the ground that petitioners lacked standing, but vacated the court's jurisdictional rulings regarding *Johnson. See Coalition of Clergy v. Bush,* 310 F.3d 1153 (9th Cir. 2002).

Following our decision, Belaid Gherebi filed an amended next-friend habeas petition in this Court, on behalf of his brother Faren, in which the standing issue is not present. In his February 2003 Amended Petition, Gherebi[4] alleged violations of the U.S. Constitution and the Third Geneva Convention arising out of his involuntary detention at Guantanamo, a naval base "under the exclusive and complete jurisdiction of the respondents," and he further claimed that, "Respondents have characterized Gherebi as an 'unlawful combatant,' and have denied him status as a prisoner of war, have denied him rights under the United States Constitution, ... have denied him access to the United States Courts," and have denied him access to legal counsel.[5] The government did not respond. Thereafter, Gherebi urged this Court to resolve the "threshhold question" of federal subject matter jurisdiction in a

---

3. *See* Neil A. Lewis, *U.S. Erecting a Solid Prison at Guantanamo for Long Term,* N.Y. TIMES, Oct. 23, 2003, at A20 (discussing building of a hard-walled traditional prison as an acknowledgment that detainees from Afghanistan will be kept for years).

4. From here on, "Gherebi" refers to the detainee, Faren Gherebi, rather than to his brother and next friend, Belaid.

5. The Petition read, in relevant part:

2. Beginning on or about January 11, 2002, and continuing to date, respondents under force of arms and involuntary brought to U.S. Naval Station, Guantanamo Bay, Cuba (hereinafter "GITMO"), under the exclusive and complete jurisdiction of respondents in the nation of Cuba, Gheredi, whom respondents captured in the nation of Afghantisan.

3. Gherebi continues to be held against his will, illegally, under force of arms, incommunicado, and in violation of the United States Constitution and the Third Geneva

motion to grant his petition summarily.[6] At that point, the government moved to dismiss Gherebi's petition without prejudice to its being re-filed in the district court, or alternatively, to transfer it to the district court so that the district judge could decide the question of jurisdiction. A motions panel of this Court granted the government's request, transferring Gherebi's petition to the United States District Court for the Central District of California. After additional motions were filed with the district court urging summary disposition of the jurisdictional question, that court issued a reasoned order on May 13, 2003 dismissing Gherebi's petition for lack of jurisdiction. *See Gherebi v. Bush,* No. CV 03–1267–AHM(JTL) (C.D.Cal. May 13, 2003) (order dismissing petition for lack of jurisdiction). The court held that *Johnson v. Eisentrager* controlled and foreclosed jurisdiction over Gherebi's petition in any federal court because Guantanamo "is not within sovereign U.S. territory." *Id.* at 5. In so holding, the court described its conclusion as "reluctant[ ]," *id.* at 2, and expressed hope that "a higher court w[ould] find a principled way" to provide the remedy of habeas corpus. *Id.* at 15.

On appeal before this Court, Gherebi argues that (1) the district court erred in holding that *Johnson v. Eisentrager* pre-cludes the district courts of this nation from exercising jurisdiction over his petition; and (2) the District Court for the Central District of California has jurisdiction to hear the writ because the custodians of the prisoners are within the jurisdiction of the court. We agree with Gherebi on both points. In so holding, we underscore that the issue before us is not whether Gherebi's detention will withstand constitutional inquiry, but rather whether the courts of the United States are entirely closed to detainees held at Guantanamo indefinitely—detainees who would appear to have no effective right to seek relief in the courts of any other nation or before any international judicial body.

We recognize that the process due "enemy combatant" habeas petitioners may vary with the circumstances and are fully aware of the unprecedented challenges that affect the United States' national security interests today, and we share the desire of all Americans to ensure that the Executive enjoys the necessary power and flexibility to prevent future terrorist attacks. However, even in times of national emergency—indeed, particularly in such times—it is the obligation of the Judicial Branch to ensure the preservation of our constitutional values and to prevent the Executive Branch from running roughshod over the rights of citizens and aliens alike.

---

Convention, and he has been denied access to legal representatives.

4. Respondents have characterized Gherebi as an "unlawful combatant," and have denied him status as a prisoner of war, have denied him rights under the United States Constitution, and have denied him access to the United States Courts.

5. Gherebi is unlawfully detained.

6. Respondents are the persons who have illegal and exclusive custody of Gherebi.

**6.** In a memorandum filed with this Court, Gherebi stated:

What is sought by this petition is: acknowledgment that Gherebi is detained by respondents; that the reason for Gherebi's detention be stated; that Gherebi be brought physically before the court for a determination of his conditions of detention, confinement, and status, which conditions are contended to be in violation of the Due Process Clause of the Fifth and Fourteenth Amendments and the cruel and unusual punishment clause of the Eighth Amendment, and be ordered to be brought into compliance with those Amendments; that Gherebi be accorded his right under the Sixth Amendment of equal access to counsel; that Gherebi be released; and for any and all appropriate other and further action.

Here, we simply cannot accept the government's position that the Executive Branch possesses the unchecked authority to imprison indefinitely any persons, foreign citizens included, on territory under the sole jurisdiction and control of the United States, without permitting such prisoners recourse of any kind to any judicial forum, or even access to counsel, regardless of the length or manner of their confinement. We hold that no lawful policy or precedent supports such a counter-intuitive and undemocratic procedure, and that, contrary to the government's contention, *Johnson*

neither requires nor authorizes it. In our view, the government's position is inconsistent with fundamental tenets of American jurisprudence and raises most serious concerns under international law.[7]

Accordingly, we reverse the ruling of the district court that jurisdiction over Gherebi's habeas petition does not lie.

## II. DISCUSSION

### A. Johnson v. Eisentrager *as a Bar to Jurisdiction*

To support its contention that habeas jurisdiction does not lie with respect to the

---

7. Gherebi argues that the government's policy of "indefinite detention" is violative of international law. While we recognize the gravity of Gherebi's argument, we need not resolve that question in this proceeding. We note, however, that the government's position here is at odds with the United States' longtime role as a leader in international efforts to codify and safeguard the rights of prisoners in wartime. It is also at odds with one of the most important achievements of these efforts—the 1949 Geneva Conventions, which require that a competent tribunal determine the status of captured prisoners. Article 5 of the Third Geneva Convention provides:

> Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 [defining POWs], such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 5, 6 U.S.T. 3316, 75 U.N.T.S. 135. In *Johnson v. Eisentrager*, itself, the Court discussed the United States' international obligations under the predecessor Convention, which did not even contain the due process rights afforded prisoners of war in the 1949 Treaty. The Court explained:

> We are not holding that these prisoners have no right which the military authorities are bound to respect. The United States, by the Geneva Convention of July 27, 1927 ... concluded with forty-six other countries, including the German Reich, an agreement upon the treatment to be accord-

ed captives. These prisoners claim to be and are entitled to its protection.

339 U.S. at 789 n. 14, 70 S.Ct. 936. The government's own regulations have adopted this same requirement. *See* Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, U.S. Army Regulation 190-8, ch. 1-5, ¶ a, Applicable to the Departments of the Army, the Navy, the Air Force, and the Marine Corps, Washington D.C. (Oct. 1, 1997) ("All persons taken into custody by U.S. forces will be provided with the protections of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War ('GPW') until some legal status is determined by competent authority."). The requirement of judicial review of executive detention is also reflected in the International Covenant on Civil and Political Rights, to which the United States is a party. *See* International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, art. 9, ¶ 4 ("Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that a court may decide without delay on the lawfulness of his detention...."). Here, however, the government has maintained that the Guantanamo detainees do not enjoy any substantive protections as a matter of right pursuant to our international obligations; instead, it has asserted only that it will apply "the principles" of the Third Geneva Convention "to the extent appropriate and consistent with military necessity." Office of the Press Secretary, Fact Sheet, Status of Detainees at Guantanamo, Feb. 7, 2002, at 1, *at* http://www.whitehouse.gov/news/releases/2002/02/20020207–13.html.

Guantanamo detainees in the Central District or any other district court of the United States, the government relies primarily on *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). *Johnson* involved a habeas petition by German enemy prisoners detained in Landsberg Prison, Germany, after being tried and sentenced to a fixed term of confinement by a U.S. Military Commission in Nanking, China for offenses committed in China subsequent to the unconditional surrender of Germany at the end of World War II. The Court declined to exercise jurisdiction, holding that the German national petitioners, tried in China for acts committed there, and confined to prison in Germany, had no right to seek a writ of habeas corpus in a United States court to test the legality of such detention. *Id.* at 790, 70 S.Ct. 936.

In connection with its holding, the Court discussed two factors: first, that the prisoners were "alien enemies" in a declared war, *see generally id.* at 769–776, 70 S.Ct. 936 (discussing the significance of alien enemy status and the reach of jurisdiction); and second, that the petitioners were detained outside "any territory over the which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." *Id.* at 777–78, 70 S.Ct. 936; *see generally id.* at 777–85, 70 S.Ct. 936 (discussing the significance of extraterritorial situs, or situs outside U.S. sovereign territory, and the

reach of jurisdiction). The Court explained:

> We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an *alien enemy* who, at *no relevant time and in no stage of his captivity, has been within its territorial jurisdiction.* Nothing in the text of the Constitution extends such a right, nor does anything in our statutes.

399 U.S. at 768, 90 S.Ct. 2230 (emphasis added). The *Johnson* Court did not suggest that the mere "alien enemy" status of petitioners would be sufficient in itself for the denial of habeas jurisdiction; rather it emphasized that in the case of alien enemies habeas is not available when their acts and the situs of their trial and detention all lie outside of this nation's territorial jurisdiction.[8]

The government contends that the exercise of habeas jurisdiction over Gherebi's petition is foreclosed by *Johnson* because the conditions that justified the Court's decision there apply equally to Gherebi and the other Guantanamo detainees. We may assume, for purposes of this appeal, that most, if not all of those being held at Guantanamo, including Gherebi, are indeed the equivalent of "alien enemies," indeed "enemy combatants," although we do not foreclose here Gherebi's right to challenge the validity of that assumption upon remand. The dispositive issue, for purposes of this appeal, as the government acknowledges, relates to the legal status of Guantanamo, the site of petitioner's deten-

---

8. Although the Court discussed the question whether certain Fifth Amendment rights were available to enemy soldiers (and stated that they were not), the essence of its holding is as set forth above. Certainly, the government construes *Johnson* as foreclosing the right of enemy aliens to file habeas petitions in cases in which there is no relevant connection with U.S. territorial jurisdiction or sovereignty, as the case may be. We accept that construction for purposes of this appeal. We also believe it to be the most reasonable construction of the Court's decision. Whether that decision should stand is, of course, a matter for the Supreme Court and not for us.

tion. It is our determination of that legal status that resolves the question regarding the dispositive jurisdictional factor: whether or not Gherebi is being detained within the territorial jurisdiction of the United States or within its sovereign jurisdiction, as the case may be.

On this appeal, the government does not dispute that if Gherebi is being detained on U.S. territory, jurisdiction over his habeas petition will lie, whether or not he is an "enemy alien." In *Ex parte Quirin,* 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942) and *In re Yamashita,* 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499(1946), the Court reviewed the merits of the habeas petitions filed by enemy alien prisoners detained in U.S. sovereign (or then-sovereign) territory. In *Quirin,* the Court rejected on the merits the claim of enemy German petitioners held in Washington DC (and executed there) that the President was without statutory or constitutional authority to order them to be tried by a military commission for the offenses with which they were charged and had been convicted by the Commission; it then ruled that the Commission had been lawfully constituted and the petitioners lawfully tried and punished by it. 317 U.S. at 20–21, 63 S.Ct. 1. In *Yamashita,* the Court reviewed on the merits a similar World War II habeas claim on behalf of an enemy Japanese general, detained in the Philippines, which

was U.S. territory at the time. Yamashita had already been tried, convicted, and sentenced to death by a military commission. Following *Quirin,* 317 U.S. at 7–9, 63 S.Ct. 1 the Court determined that the commission had been lawfully constituted, and that petitioner was lawfully detained pursuant to his conviction and sentence. *Id.* at 25–26, 63 S.Ct. 1. We need not resolve the question of what constitutional claims persons detained at Guantanamo may properly allege if jurisdiction to entertain habeas claims exists. Suffice it to say that if jurisdiction does lie, the detainees are not wholly without rights to challenge in habeas their indefinite detention without a hearing or trial of any kind, and the conditions of such detention.

### B. Territorial Jurisdiction and Sovereignty

■ With respect to the Guantanamo detainees, the government contends that, under *Johnson,* the touchstone of the jurisdictional inquiry is *sovereignty*—not mere *territorial jurisdiction*—and that the United States does not maintain sovereignty over the territory at issue. Jurisdiction is foreclosed, the government argues, because although the 1903 Lease agreement (and the 1934 Treaty continuing the agreement ["the Lease and continuing Treaty"])[9] which governs the terms of Guantanamo's territorial relation-

---

9. The United States occupies Guantanamo under a lease entered into by President Theodore Roosevelt with the Cuban government in 1903, supplemented by a 1903 agreement, and continued in effect by a subsequent treaty executed by President Franklin Delano Roosevelt in 1934. The treaty is of indefinite duration and cannot be terminated without the United States' agreement, or the abandonment of the base property by the United States.

The 1903 Lease was meant to implement the provisions of Article VII of a 1901 Act of Congress (and of Article VII of the Appendix to the Constitution of Cuba) (the "Platt

Amendment") providing for the sale or lease of land to the U.S. for coaling or naval stations "to enable the United States to maintain the independence of Cuba, and to protect the people thereof, as well as for its own defense" following the Spanish–American War. *See* Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 16–23, 1903, U.S.-Cuba, T.S. 418 (excerpting Article VII and explaining this purpose) [hereinafter "the 1903 Lease"]. Article III of the Lease reads, in pertinent part:

While on the one hand the United States recognizes *the continuance of the ultimate*

ship to the United States cedes to the U.S. "complete jurisdiction and control" over the Base, it recognizes the "continuance of ultimate sovereignty" in Cuba. In other words, in the government's view, whatever the Lease and continuing Treaty say about the United States' complete *territorial jurisdiction*, Guantanamo falls outside U.S. *sovereign* territory—a distinction it asserts is controlling under *Johnson.*

Although we agree with the government that the outcome of the jurisdictional question in this case hinges on the legal status of the *situs* of Gherebi's detention, we do not read *Johnson* as holding that the prerequisite for the exercise of jurisdiction is *sovereignty* rather than *territorial jurisdiction.* Nor do we believe that the jurisdiction the United States exercised over Landsberg Prison in Germany is in any way analogous to the jurisdiction that this nation exercises over Guantanamo. When the *Johnson* petitioners were detained in Landsberg, the limited and shared authority the U.S. exercised over the Prison on a temporary basis nowhere approached the United States' potentially permanent exercise of complete jurisdiction and control over Guantanamo, including the right of eminent domain. The United States has exercised "complete jurisdiction and control" over the Base for more than one century now, "with the right to acquire . . . any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof." [10] We have also treated Guantanamo as if it were subject to American

---

*sovereignty of the Republic of Cuba* over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement the *United States shall exercise complete jurisdiction and control* over and within said areas with the right to acquire . . . for the public purposes of the United States any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof.

*Id.*, art. III (emphasis added).

Under a supplementary agreement, the United States was afforded the exclusive right to try citizens and non-citizens for crimes committed on the Base. Article IV reads, in relevant part:

Fugitives from justice charged with crimes or misdemeanors amenable to Cuban Law, taking refuge within said areas, shall be delivered up by the United States authorities on demand by duly authorized Cuban authorities.

*On the other hand, the Republic of Cuba agrees that fugitives from justice charged with crimes or misdemeanors amenable to United States law, committed within said areas, taking refuge in Cuban territory, shall on demand, be delivered up to duly authorized United States authorities.*

*See* Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.-Cuba, art. IV,

T.S. No. 426 (emphasis added) [hereinafter "the 1903 Supplemental Agreement"]. Under Article I of the same, the U.S. agreed to pay Cuba the annual sum of two thousand dollars in rent, *see id.*, art. I; and under Article III, the United States agreed to a limit on establishing commercial or industrial enterprises on the lands. *Id.*, art. III.

A 1934 treaty reaffirmed the original 1903 agreements, extending the Lease in the same form and on the same conditions "[s]o long as the United States of America shall not abandon the said naval station of Guantanamo" and the two contracting parties do not "agree to the modification or abrogation of the stipulations of the agreement." Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, art. III, 48 Stat. 1682, 1683, T.S. No. 866.

10. There was no lease or treaty conveying total and exclusive U.S. jurisdiction and control over Landsberg. In fact, after Landsberg was taken over by U.S. forces following World War II, three flags flew over the town: the American, British, and French flags. *See* History of Landsberg Airbase, http://www.furstytreemovers-landsbergbavarians.org/history_of_landsberg.htm (last visited Nov. 10, 2003). Although the *Johnson* petitioners were held pursuant to conviction by proceedings conducted under U.S. auspices, the

sovereignty: we have acted as if we intend to retain the Base permanently, and have exercised the exclusive, unlimited right to use it as we wish, regardless of any restrictions contained in the Lease or continuing Treaty.

When conducting its jurisdictional inquiry in *Johnson,* the Court spoke at different times of U.S. "territorial jurisdiction" and "sovereignty"—using the latter term on a minority of occasions [11] because it was indisputable that Landsberg Prison was *not* within either U.S. territorial jurisdiction or U.S. sovereign territory. The only question for the *Johnson* Court was whether it could exercise jurisdiction over petitioners' habeas claims in light of the fact that they were being detained on foreign ground that was not, under any recognized legal standard, treated as American territory. And while the Court expressly distinguished *Yamashita* on the basis that the United States possessed "*sovereignty* at this time over these insular possessions,"

(the Philippines), the Court nowhere suggested that "sovereignty," as opposed to "territorial jurisdiction," was a necessary factor. In fact, immediately following this statement, the Court specifically noted *three* "heads of jurisdiction" that petitioners might have invoked, none of which used the term "sovereignty" and all of which referred instead to "territory":

> Yamashita's offenses were committed on our *territory,* he was tried within the *jurisdiction* of our insular courts and he was imprisoned within *territory* of the United States. *None of these heads of jurisdiction can be invoked by these prisoners.*

*Id.* at 780, 70 S.Ct. 936 (emphasis added). Accordingly, *Johnson* in no way compels the conclusion that, where the U.S. exercises "territorial jurisdiction" over a situs, that degree of territorial authority and control is not sufficient to support habeas jurisdiction. To the contrary, it strongly implies that territorial jurisdiction *is* suffi-

---

Landsberg criminal facility was formally designated with the purpose of serving as a prison where executions of war criminals convicted during the Allied trials at Nuremberg, Dachau and Shanghi would be carried out, and the arrangement was dissolved a little more than a decade thereafter, in May 1958. See Landsberg Prison for War Criminals, http://www.buergervereinigung-landsberg. org/english/warcriminals/warcriminals.shtml (last visited at Nov. 10, 2003). That the named respondents in JohnsonBthe Secretary of Defense, Secretary of the Army, Chief of Staff of the Army, and the Joint Chiefs of Staff—denied that petitioner's immediate custodian, the Commanding General of the European Command, "was subject to their direction," is telling of the less-than-exclusive nature of U.S. control over the prison. *Johnson,* 339 U.S. at 766–68, 70 S.Ct. 936.

11. *The Court spoke to the issue of the extra-territorial situs of petitioners in eight instances in the opinion; at only two of these points does the term "sovereign" or "sovereignty" appear. See, e.g., 339 U.S. at 768, 70 S.Ct.*

936 ("We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its *territorial jurisdiction.*") (emphasis added); *id.* at 771, 70 S.Ct. 936 ("But in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its *territorial jurisdiction* that gave the Judiciary power to act.") (emphasis added). Moreover, the dissent never uses the word "sovereignty" and strongly criticizes the majority for making "territorial jurisdiction" the touchstone of the jurisdictional inquiry. *See id.* at 952 (Black, J., dissenting) ("Conceivably a majority may hereafter find citizenship a sufficient substitute for *territorial jurisdiction* and thus permit courts to protect Americans from illegal sentences. But the Court's opinion inescapably denies courts power to afford the least bit of protection for any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared.") (emphasis added).

cient. In short, we do not believe that *Johnson* may properly be read to require "sovereignty" as an essential prerequisite of habeas jurisdiction.[12] Rather territorial jurisdiction is enough.

■ It is evident that the United States exercises sole territorial jurisdiction over Guantanamo. "Territorial jurisdiction" exists as to "territory over which a government or a subdivision thereof, or court, has jurisdiction." *See* BLACK'S LAW DICTIONARY 1473 (6th ed.1990). The U.S. government exercises the "power to proscribe, prescribe, adjudicate, and enforce the law" in Guantanamo, *see New Jersey v. New York*, 1997 WL 291594, at * 28 (U.S.1997), *received at* 520 U.S. 1273, *and reviewed at* 523 U.S. 767, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998) (describing the "natural and ordinary meaning of 'jurisdiction' "), and further, the government's jurisdiction is both "complete," *see* 1903 Lease, art. III,

*supra* note 9, and exclusive, *see* 1903 Supplemental Agreement, art. IV, *id* (providing that U.S. courts exercise exclusive criminal jurisdiction over citizens and aliens, alike, for offenses committed on the Base). *See also* 6 Op. Off. Legal Counsel 236, 242 (1982) (opinion of then Asst. Attorney General Ted Olsen) (concluding that Guantanamo falls within "exclusive United States' jurisdiction," "because of the lease terms which grant the United States 'complete jurisdiction and control over' that property"). Where a nation exercises "exclusive jurisdiction" over a territory, territorial jurisdiction lies. *See U.S. v. Corey*, 232 F.3d 1166, 1172–76 (9th Cir. 2000) (examining a provision of a congressional act that defined territorial jurisdiction to include territory within the "exclusive jurisdiction" of the United States).

■ Here, the relationship between territorial jurisdiction and the right to file

---

12. At least two Justices of the current Court appear to agree. *See Zadvydas v. Davis*, 533 U.S. 678, 704 n. *, 121 S.Ct. 2491 (2001) (Scalia, J., dissenting) (stating, in a dissent joined by Justice Thomas, that *Johnson* involved the "military's detention of enemy aliens outside the *territorial jurisdiction* of the United States") (emphasis added).

That *Johnson* should not be read to foreclose jurisdiction where the United States exercises exclusive authority and control is bolstered by Justice Jackson's own dissent several years later in *Shaughnessy v. U.S. ex. rel. Mezei*, 345 U.S. 206, 218, 73 S.Ct. 625, 97 L.Ed. 956 (1953), in which the author of the *Johnson* majority opinion expressed strong views about the requisites of procedural due process where an alien was detained indefinitely on a unique parcel of U.S. territory, "in his temporary haven on Ellis Island." *Id.* at 207, 73 S.Ct. 625. In *Shaughnessy*, an alien immigrant permanently excluded from the United States on security grounds, and functionally detained indefinitely on Ellis Island because other countries would not take him back, petitioned for habeas corpus asserting unlawful confinement. The majority treated his case like a regular exclusion proceeding, and de-

nied Mezei's petition. In vigorous dissent, Justice Jackson wrote:

> Fortunately, it is still startling, in this country, to find a person held indefinitely in executive custody without accusation of a crime or judicial trial ... Procedural fairness and regularity are of the indispensable essence of liberty ... Because the respondent has no right of entry, does it follow that he has no rights at all? Does the power to exclude mean that exclusion may be continued or effectuated by any means which happen to seem appropriate to the authorities? ... when indefinite confinement becomes the means of enforcing exclusion, it seems to me that due process requires that the alien be informed of its grounds and have a fair chance to overcome them ... It is inconceivable to me that this measure of simple justice and fair dealing would menace the security of this country. No one can make me believe that we are that far gone.

*Id.* at 632–37. Although the legal status of Guantanamo is not as clear-cut as that of Ellis Island, the eloquent words of *Johnson's* author carry a powerful message for the present case and caution strongly against a narrow reading of his earlier decision.

habeas petitions is particularly clear. The United States exercises exclusive criminal jurisdiction over all persons, citizens and aliens alike, who commit criminal offenses at the Base, pursuant to Article IV of the Supplemental Agreement. *See supra* note 9. We subject persons who commit crimes at Guantanamo to trial in United States courts.[13] Surely, such persons enjoy the right to habeas corpus in at least some respects. Under these circumstances, for purposes of our jurisdictional inquiry, it is apparent that the United States exercises exclusive territorial jurisdiction over Guantanamo and that by virtue of its exercise of such jurisdiction, habeas rights exist for persons located at the Base. We reiterate that the essence of our inquiry involves the legal status of the situs of petitioner's detention—not the question whether "enemy combatants" in general are precluded from filing habeas petitions, or the question whether any particular constitutional issues may be raised. The first of these questions is answered by *Quirin* and *Yamashita* and the second is not before us.

In sum, we conclude that by virtue of the United States' exercise of territorial jurisdiction over Guantanamo, habeas jurisdiction lies in the present case.[14]

---

**13.** For example, in *United States v. Rogers*, 388 F.Supp. 298, 301 (E.D.Va.1975), a U.S. civilian employee, working on the Naval Base at Guantanamo Bay under a contract with the Navy, was prosecuted in the Eastern District of Virginia for drug offenses committed on the Base in violation of 21 U.S.C. §§ 841, 846. In considering Rogers' motion to suppress and Fourth Amendment claim, the court reasoned:

> By the lease, Cuba agreed that the United States should have complete control over criminal matters occurring within the confines of the base. It is clear to us that under the leasing agreement, United States law is to apply.

*Id. See also United States v. Lee*, 906 F.2d 117, 117 & n. 1 (4th Cir.1990) (per curiam) (appeal from dismissal of indictment of Jamaican national who had been charged with sexual abuse that allegedly occurred on Guantanamo. The government served subpoenas on all defense witnesses and transported them to Norfolk, Virginia, the site of the trial.); *Haitian Ctrs. Council Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir.1992), *vacated as moot sub. nom. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993) (describing testimony, in the context of this Second Circuit trial, consistent with applying U.S. criminal law to citizens and non-citizens accused of crimes on the Base).

**14.** In *Al Odah v. United States*, 321 F.3d 1134 (D.C.Cir.2003), *cert. granted,* —— U.S. ——, 124 S.Ct. 534, 157 L.Ed.2d 407, 2003 WL 22070725 (Nov. 10, 2003), the only other Court of Appeals decision to consider the question presented here, the DC Circuit rejected petitioners' arguments that *Johnson* "does not turn on technical definitions of sovereignty or territory," and opined that the text of the leases shows that Cuba—not the United States—has sovereignty over Guantanamo. 321 F.3d at 1142–43. In so holding, the DC Circuit relied in part on *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir.1995), in which the Eleventh Circuit rejected the argument that " 'control and jurisdiction' is equivalent to sovereignty," *id.* at 1425, to find that Cuban and Haitian migrants interdicted on the seas and detained outside the physical borders of the United States at Guantanamo were without constitutional and statutory rights cognizable in the courts of the United States.

The Second Circuit, however, expressed a contrary view three years before *Cuban American.* In *Haitian Ctrs.*, 969 F.2d at 1341–45, the Second Circuit affirmed a preliminary injunction prohibiting the government from returning to Haiti Haitian nationals interdicted at sea and detained at Guantanamo in the absence of a fair adjudication as to whether they were bona fide asylees. In its opinion, the court expressly distinguished *Johnson*, noting that *Johnson*, "which involved convicted, enemy aliens in occupied territories outside the United States," does not resolve the question of whether "the fifth amendment applies to non-accused, non-hostile aliens held incommunicado on a military base within the exclusive control of the United States,

### C. Limited Nature of the Question Presented

We wish to emphasize that the case before this Court does not require us to consider a habeas petition challenging the decisions of a military tribunal—a case that might raise different issues. Unlike the petitioners in *Johnson,* and even in *Yamashita* and *Quirin,* Gherebi has not been subjected to a military trial. Nor has the government employed the other time-tested alternatives for dealing with the circumstances of war: it has neither treated Gherebi as a prisoner of war (and has in fact declared that he is not entitled to the rights of the Geneva Conventions, *see supra* note 7), nor has it sought to prosecute him under special procedures designed to safeguard national security. *See U.S. v. Bin Laden,* 2001 WL 66393 (S.D.N.Y. Jan.25, 2001) (limiting access to confidential information). Instead, the government is following an unprecedented alternative [15]: under the government's theory, it is free to imprison Gherebi indefinitely along with hundreds of other citizens of foreign countries, friendly nations among them, and to do with Gherebi and these detainees as it will, when it pleases, without any compliance with any rule of law of any kind, without permitting him to consult counsel, and without acknowledging any judicial forum in which its actions may be challenged. Indeed, at oral argument, the government advised us that its position would be the same even if the claims were that it was engaging in acts of torture or that it was summarily executing the detainees. To our knowledge, prior to the current detention of prisoners at Guantanamo, the U.S. government has never before asserted such a grave and startling proposition. Accordingly, we view Guantanamo as unique not only because the United States' territorial relationship with the Base is without parallel today, but also because it is the first time that the government has announced such an extraordinary set of principles—a position so extreme that it raises the gravest concerns under both American and international law.

### D. Conclusion

In sum, we hold that neither *Johnson v. Eisentrager* nor any other legal precedent precludes our assertion of jurisdiction over Gherebi's habeas petition. Although we agree with the government that the legal status of Guantanamo constitutes the dispositive factor in our jurisdictional inquiry, we do not find that *Johnson* requires sovereignty rather than simply the existence of territorial jurisdiction, which unquestionably exists here.

---

namely Guantanamo Bay." 969 F.2d at 1343. The Second Circuit further explained:

It does not appear to us to be incongruous or overreaching to conclude that the United States Constitution limits the conduct of United States personnel with respect to officially authorized interactions with aliens brought to and detained by such personnel on a land mass exclusively controlled by the United States ... given the undisputed applicability of federal criminal laws to incidents that occur there and the apparent familiarity of the governmental personnel at the base with the guarantees of due process, fundamental fairness and humane treatment which this country purports to afford to all persons.

*Id.* Although *Haitian Centers* was subsequently vacated as moot pursuant to party settlement, *see Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), we find the Second Circuit's views to be persuasive, *see Edwards v. Madigan,* 281 F.2d 73, 78 n. 3 (9th Cir.1960), and have, in fact, recently cited this case with approval. *See Corey,* 232 F.3d at 1172.

**15.** *See, e.g.,* American College of Trial Lawyers, REPORT ON MILITARY COMMISSIONS FOR THE TRIAL OF TERRORISTS 8 (Mar.2003)("[T]he placement of the detainees at Guantanamo, w[as] carefully designed to evade judicial scrutiny and to test the limits of the President's constitutional authority.").

## III. TRANSFER

In *Rumsfeld v. Padilla*, 542 U.S. ——, 124 S.Ct. 2711, 2004 WL 1432135 (U.S. June 28, 2004), after our original opinion in this case was issued, the Supreme Court held that an American citizen detained within the United States must name his immediate custodian as the respondent in a habeas petition and must file in the district of confinement. However, the Court noted an exception to the immediate custodian and district of confinement rules "where an American citizen is detained outside the territorial jurisdiction of any district court." *Id.* at *5 n. 9 (citing *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 498, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973)), *12 n. 16. The exception applies to alien detainees at Guantanamo Bay. *See Rasul v. Bush*, 542 U.S. ——, 124 S.Ct. 2686, 2004 WL 1432134, at *9 (U.S. June 28, 2004); *see also Padilla*, —— U.S. ——, at ——, 124 S.Ct. 2711, —— L.Ed.2d ——, at ——, 2004 WL 1432135, at *15 (Kennedy, J., concurring).

We do not read either *Padilla* or *Rasul* as precluding us from exercising jurisdiction in this matter and transferring the proceedings to the appropriate forum. It appears to us that the proper venue for this proceeding is in the District of Columbia. *Cf. Rasul*, —— U.S. ——, at ——, 124 S.Ct. 2686, —— L.Ed.2d ——, at ——, 2004 WL 1432134, at *9; *Padilla*, —— U.S. ——, at —— n. 16, 124 S.Ct. 2711, —— L.Ed.2d ——, at —— n. 16, 2004 WL 1432135, at *12 n. 16 (collecting cases brought against officials of the federal government in the District of Columbia, by petitioners confined overseas). Accordingly, we order the case transferred to the District Court for the District of Columbia. 28 U.S.C. §§ 1406(a), 1404(a).[16]

**REVERSED AND TRANSFERRED FOR FURTHER PROCEEDINGS TO THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA.**

---

**16.** Because of the special circumstances of this case and the need for prompt adjudication of the habeas petition and the attendant motions, we effect the transfer, rather than remanding to the district court. *See Koehring Co. v. Hyde Constr. Co.*, 382 U.S. 362, 365, 86 S.Ct. 522, 15 L.Ed.2d 416 (1966) (per curiam) ("We do not read 28 U.S.C. § 1404(a), providing that 'a district court may transfer any civil action,' as precluding an appellate court, where unusual circumstances indicate the necessity thereof, from effecting a transfer by direct order."). That same principle applies with equal force to a 28 U.S.C. § 1406 transfer.